RAMÓN PAOLI MÉNDEZ ET AL., demandantes y recurridos, *v.* HÉCTOR RODRÍGUEZ ET AL., demandados y recurrentes.

*Número:* RE-93-152 *Resuelto:* 5 de mayo de 1995

450

*Efraín Ruiz Ruiz*, abogado del recurrente; *Ángel S. Bonilla Rodríguez*, abogado del recurrido.

El Juez Asociado Señor Alonso Alonso emitió la opinión del Tribunal.

Los hechos de este caso activan las disposiciones constitucionales y legales relativas a la conservación, el desarrollo y el aprovechamiento de nuestros recursos naturales, en particular, el agua, recurso indispensable para la vida del hombre y de todas las actividades de la sociedad.

En una acción sobre negación de servidumbre de acueducto, los demandantes solicitaron y obtuvieron sentencia sumaria a su favor. El Tribunal Superior, Sala de Utuado (Hon. Miguel A. Santiago, Juez), resolvió que a los demandados no les asiste derecho alguno con respecto a la toma y utilización del agua que emana de un ojo de agua represado en la finca de sus vecinos, los demandantes.

Las partes demandadas carecen del servicio de agua potable y alegaron ante el tribunal haber sido autorizadas por los demandantes para instalar la tubería que les provee el servicio. Alegaron, además, que el pleito debía desestimarse por no haberse agotado el trámite administrativo ante el Departamento de Recursos Naturales y Ambientales, a saber, una solicitud de franquicia para el aprovechamiento del agua.

Aplicando la Ley para la Conservación, el Desarrollo y Uso de los Recursos de Agua de Puerto Rico (en adelante Ley de Aguas de 1976) *revocamos la sentencia recurrida y devolvemos el caso al tribunal de instancia para que refiera el asunto al Departamento de Recursos Naturales y Ambientales.*

I

*Hechos*

El Sr. Ramón Paoli Méndez, su esposa, la Sra. Gladys Fuster, y la sociedad legal de gananciales compuesta por ambos, presentaron una acción negatoria de servidumbre de acueducto ante el Tribunal Superior (Sala de Utuado) contra sus vecinos, el Sr. Héctor Rodríguez, su esposa, la Sra. Marisol Mercado, el Sr. Ismael Muñiz, su esposa, la Sra. Margarita Muñiz; el Sr. Norberto Rodríguez, su esposa, la Sra. Enid Jiménez; sus respectivas sociedades legales de gananciales; el Sr. Rubén Crespo; la Sra. Daisy Crespo y el Sr. Nelson Alumez. En la demanda se alegó que los demandantes eran propietarios de una finca de ciento treinta y tres (133) cuerdas, dedicada al cultivo de café, chinas, guineos y plátanos, ubicada en el Barrio Mirasol de Lares. Se alegó que dentro de la referida finca existe un ojo de agua que fue represado y que mediante una bomba provee agua para el riego de los cultivos. Se alegó en la demanda que los vecinos demandados instalaron un tubo en el ojo de agua sin el consentimiento de la parte demandante y se servían así del agua que de él proviene. Por ello, se solicitó que el tribunal determinara que no existe servidumbre de acueducto en beneficio de los demandados.

En su contestación a la demanda, los demandados alegaron que los demandantes no sólo los autorizaron a utilizar el agua, sino que incluso estuvieron presentes cuando se instaló la tubería que les sirve. Alegaron, además, que se había presentado una querella ante el Departamento de Recursos Naturales y Ambientales por el control ejercido por las partes demandantes sobre el ojo de agua y para impedir que ellos se beneficiaran de él para atender sus necesidades básicas.[1]

---

[1] Surge de la contestación a la demanda que los demandados alegaron haber solicitado al Departamento de Recursos Naturales y Ambientales que se determine el

Los demandados solicitaron la desestimación de la demanda por no haberse agotado el trámite administrativo y reclamaron la existencia de una servidumbre forzosa de acueducto, continua, aparente y positiva.

Trabada la controversia, los demandantes presentaron una moción de sentencia sumaria en la que alegaron que no existía una controversia de hechos. Plantearon que en el caso de autos *no* existe servidumbre de acueducto y que bajo el Código Civil sólo podría reconocerse una servidumbre de saca de agua y abrevadero. Sostuvieron que los demandados *no* podían beneficiarse de la servidumbre de saca y abrevadero al carecer de legitimación activa para solicitarla.

Por su parte, los demandados presentaron una moción en oposición a sentencia sumaria en la que, en síntesis, alegaron la existencia de hechos en controversia lo cual impedía que se resolviera sumariamente el caso. Señalaron en la referida moción que los demandantes les autorizaron la toma de agua. Los demandados señalaron nuevamente que existe una servidumbre forzosa de acueducto y que no se habían agotado los remedios administrativos.

El 23 de febrero de 1993 el tribunal de instancia dictó sentencia que acogía el planteamiento de los demandantes y resolvió que, como los hechos no estaban en controversia, la solución del caso sólo requería que se interpretara el Art. 491 del Código Civil sobre las servidumbres de saca de agua y abrevadero que establece: "Las servidumbres forzosas de saca de agua y de abrevadero solamente podrán imponerse por causa de utilidad pública en favor de alguna población o caserío, previa la correspondiente indemnización." 31 L.P.R.A. sec. 1714. Conforme a ello, concluyó que al no constituir los demandados un poblado o caserío no podían beneficiarse de esta disposición legal y que, en todo caso, carecían de legitimación activa para

---

uso y aprovechamiento del referido cuerpo de agua y que la situación se declare un "estado de emergencia".

reclamarla. El tribunal de instancia remitió a los demandados a que exigieran al Municipio o a la Autoridad de Acueductos que les proveyeran el servicio de agua. La demanda fue declarada con lugar y se resolvió que los demandados *no* tenían derecho a ningún tipo de servidumbre en materia de aguas sobre la finca de la parte demandante.

Inconformes con lo resuelto, acudieron en revisión los demandados, señalando en apoyo a su solicitud los errores siguientes:

(1) Declarar ha lugar la Moción Solicitando Sentencia Sumaria a favor de los demandantes aun cuando existía una disputa bonafide de hechos y aun cuando existía controversia de hechos.

(2) Dictar sentencia sumaria a favor de los demandantes aun cuando existía derecho a una servidumbre forzosa de acueducto mediante indemnización, existía servidumbre de saca de agua y abrevadero a tenor con los arts. 491, *supra*, y el Art. 492 del Código Civil, 31 L.P.R.A. sec. 1715.

(3) Asumir jurisdicción aun cuando los demandantes no habían agotado los remedios administrativos.

(4) Declarar con lugar la sentencia sumaria y no aplicar la Ley Núm. 136 de 3 de junio de 1976 (12 L.P.R.A. sec. 1501 *et seq.*) conocida como la Ley de Aguas de 1976.

(5) No aplicar los principios de equidad en un caso de emergencia y de interés público.

Mediante Resolución de 16 de abril de 1993 expedimos el recurso. Posteriormente, por surgir del expediente que ambas partes habían solicitado una franquicia para el aprovechamiento y uso de agua ante el Departamento de Recursos Naturales y Ambientales,[2] ordenamos a las partes que acreditaran ante nos el estado de los procedimientos administrativos. Cumplidos todos los trámites de rigor y con el beneficio de los alegatos y escritos de la partes, resolvemos.

---

[2] La parte demandante recurrida alegó en su réplica a la oposición a la solicitud de sentencia sumaria que había solicitado una franquicia ya que era en el terreno de su propiedad donde nacía el agua.

## II

*Importancia del recurso del agua*

El agua es uno de los elementos esenciales e indispensables para satisfacer las necesidades de la vida y para ejercer la mayor parte de las actividades económicas, agrícolas e industriales.

En el organismo humano el agua es vital. Mientras el cuerpo reciba suficiente cantidad de líquidos, una persona puede estar períodos de tiempo, relativamente largos, sin otros nutrientes.[3] El agua compone dos terceras (2/3) partes del cuerpo humano, por lo que para mantenerse saludable una persona promedio necesita más de medio galón de agua diariamente.[4] Ingerir menos de un cuarto (1/4) de galón al día puede ser fatal.[5]

Otras innumerables actividades humanas requieren también del preciado líquido. Se estima que una familia promedio en Estados Unidos utiliza al año ciento siete mil (107,000) galones de agua para las diversas funciones del hogar.[6] Diariamente en Puerto Rico se extraen cerca de seiscientos (600) millones de galones de agua, de fuentes subterráneas y superficiales.[7] Estas últimas proveen cerca de trescientos (300) millones de galones diarios de agua potable.[8]

Las actividades económicas requieren una porción aun mayor del recurso. La industria es una consumidora voraz de agua, incluso para aquellas tareas que uno no suele relacionar con el agua. La fabricación de un automóvil, por ejemplo, requiere treinta y nueve mil noventa (39,090) galones de agua; un barril de cerveza necesita mil quinientos

---

[3] 4 *Lawyers' Medical Cyclopedia* Sec. 30.15, pág. 191 (1975).

[4] *Facts About Water*, American Water Works Association, [s.f.].

[5] *Supra*, nota 3, pág. 193.

[6] *Supra*, nota 4.

[7] Informe Anual de la Junta de Calidad Ambiental de 1992, pág. 4.

[8] Íd.

(1,500) galones; una tonelada de acero, sesenta y dos mil seiscientos (62,600), galones, y una tonelada de azúcar, veintiocho mil cien (28,100) galones.([9]) La agricultura es uno de los sectores que más depende del agua, hecho evidenciado durante la reciente sequía, el cual fue el área de la economía más afectada.([10]) En Puerto Rico la agricultura consume más de cuarenta y dos (42) millones de agua diarios.([11])

Es de conocimiento común que todos los recursos naturales son particularmente vulnerables a la actividad humana y a los cataclismos de la naturaleza. Su conservación, desarrollo y administración han de considerarse como una tarea imprescindible si se pretende garantizar que el recurso, cualquiera que sea, satisfaga las necesidades vitales y económicas de un pueblo. El agua, sin embargo, tiene unas propiedades físicas que la convierten en uno de los recursos más difíciles de conservar. Como líquido al fin, es fluida, fugitiva, volátil y dinámica, lo que dificulta almacenarla y la hace peligrosamente fácil contaminar. Véase A. Guaita, *Derecho Administrativo: Aguas, Montes, Minas*, Madrid, Ed. Civitas, 1986, pág. 115. A diferencia también de otros recursos naturales que se someten con menos resistencia a la intervención humana, el agua es "irreemplazable, no ampliable por la mera voluntad del hombre, [e] irregular en su forma de presentarse en el tiempo y en el espacio ...". Preámbulo de la Ley de Aguas de España, II (Anot. 1981) Aranzadi, *Repertorio Cronológico de Legislación* 3862 (1985). *Ley de Aguas*, Boletín Oficial del Estado, Madrid, 1986, pág. 15.

Otra característica que la distingue es que sus reservas no yacen en sitios determinados y que las fuentes de reabastecimiento no se originan en el mismo lugar de

---

([9]) Íd.

([10]) "Análisis del Impacto de la Sequía en la Economía de Puerto Rico Durante los Años Fiscales 1994 y 1995, Junta de Planificación, agosto de 1994.

([11]) *Supra*, nota 7.

extracción. El agua no permanece en un lugar, ya que la evaporación y la gravedad la mueven constantemente, agotando y abasteciendo las fuentes de las que todos nos servimos. Estos factores impiden tomar el agua como una sucesión de fenómenos aislados, por lo que todo plan sensato de conservación, desarrollo y administración ha de incluir el ciclo hidrológico de evaporación, desemboque en el mar, lluvia, filtración, etc.

Finalmente, hay que tomar en consideración la proporción relativamente pequeña del recurso que nos es de utilidad en su estado natural, pues si bien el agua cubre ochenta por ciento (80%) de la superficie terráquea, sólo uno porciento (1%) de toda ésta sirve para el consumo humano.[12]

La combinación de indispensabilidad, revesado mantenimiento y alta vulnerabilidad del agua requieren una estrategia de conservación, desarrollo y administración eficaz, comprensiva y preventiva; labor tan enorme y costosa que por lo general sólo el Estado puede llevarla a cabo. Ante tal realidad, la gran mayoría de los ordenamientos jurídicos modernos —incluso aquellos que cuentan con vastos abastos de agua— han optado por promover la intervención gubernamental aun a costa de intereses propietarios individuales. A. Reverte Navarro y E. Pérez Pérez, *Legislación de Aguas*, Madrid, Ed. Tecnos, 1986, pág. 14. La necesidad de integrar el ciclo hidrológico entero dentro de los planes de conservación, desarrollo y administración dificulta aun más reconocer derechos exclusivos sobre fuentes del recurso del agua. En ·aras de obtener un máximo rendimiento, el Estado tiene que establecer un balance, no sólo entre los intereses privados y públicos, sino también entre los diversos sectores socioeconómicos que requieren del recurso para su subsistencia.

Los intereses en pugna y la necesidad del recurso obligan al Estado a formular y ejecutar planes de conserva-

---

[12] *Supra*, nota 4.

ción, desarrollo y administración "en un doble orden de actividades, relacionadas a su vez objetivamente: por una parte, la acción de vigilancia y distribución del agua; por otra una actividad concreta que se realiza buscando alcanzar el máximo rendimiento en la explotación de los caudales públicos". E. Martín-Retortillo, *Aguas públicas y obras hidráulicas*, Madrid, Ed. Tecnos, 1966, pág. 293. Los experimentos exitosos en lugares con serios problemas hidrológicos como Israel, España y el Suroeste de Estados Unidos han demostrado que, aun en climas áridos o en regiones densamente pobladas, una sabia política de manejo y conservación permite un rendimiento óptimo. F. Cerrillo Quílez, *Régimen jurídico-administrativo de las aguas públicas y privadas*, Barcelona, Ed. Jurídica Española, [s. año] T. 1, pág. 33. Véase Guaita, *op. cit.*

Puerto Rico, por ser una isla con una densidad poblacional alta y con pocas fuentes de recursos naturales, se encuentra en una situación de especial vulnerabilidad.

El exprofesor Luis Negrón García, líder intelectual y pionero en Puerto Rico en la conceptualización e identificación de los problemas y la búsqueda de soluciones del recurso, discutió las dificultades del uso y conservación del agua en Puerto Rico como antesala al proyecto que culminaría en la Ley de Aguas de 1976:

> La conservación de los recursos naturales en general, y de algunos, como el agua, en particular, es asunto de reciente pero intensa preocupación en casi todos los países del mundo. El vertiginoso cambio social y económico cuya raíz principal es el acelerado avance tecnológico ha tenido, entre otras múltiples resultantes, un marcado deterioro en la calidad del medio ambiente. La explicación a esta ocurrencia se da en términos de que la inversión de recursos humanos y económicos para lograr ese progreso no ha ido acompañada de inversiones equivalentes —o al menos las necesarias— en estudios sobre el impacto negativo ambiental de esos cambios y las medidas preventivas y correctivas requeridas, tanto a nivel legislativo como de programa, para reducir en lo posible esas consecuencias adversas.
>
> Lo anterior ha tenido como consecuencia que los problemas del medio ambiente, en general y de recursos naturales en par-

ticular, se han atacado en forma improvisada, sin responder a un enfoque global de desarrollo balanceado, y sin estrategias definitorias de una política de calidad ambiental.

Esta característica de visión remedial que tipifica la gestión gubernamental en la problemática del medio ambiente no es privativa de Puerto Rico. La misma es un rasgo de aquellos países que se envuelven en programas intensos de desarrollo económico, principalmente por medio de la industrialización. L.N. Negrón García, *Proyecto de Ley de Desarrollo de Aguas de Puerto Rico*, Ed. Rev. Jur. U.P.R., Río Piedras, pág. 1.

Tomar las medidas necesarias para asegurar su rendimiento y así satisfacer las necesidades básicas de la población y conservar este nivel de extracción son obligaciones impuestas tanto por nuestras condiciones geográficas, climatológicas y poblacionales, como por las obligaciones legales provenientes de la Constitución y las leyes.

## III

*Naturaleza constitucional y legal del recurso del agua*

La Convención Constituyente del Estado Libre Asociado entendió que la conservación de nuestros recursos naturales era tan importante para la seguridad de Puerto Rico que el deber de velar por ellos debía ser elevado a rango constitucional.

La Sec. 19 del Art. VI de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 379, dispone que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad ...".

La importancia de este mandato constitucional no debe ser menospreciada. El Art. VI de nuestra Constitución, *supra*, no se reduce a un mero postulado de principios. J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Ed. U.P.R., 1982, Vol. III, pág. 235. Los delegados a la Convención Constituyente derrotaron una propuesta

para relegarla al ámbito de ley por entender que era de vital importancia para el desarrollo y la seguridad de los habitantes del País. El delegado Santiago Polanco Abreu, quien tomó el podio para expresarse en contra de la eliminación del Art. VI, *supra*, que solicitaba el delegado Jaime Benítez, expresó: "No hay un error teórico. Estamos conscientes de lo que estamos haciendo. Estamos estructurando algo, la conservación del recurso natural. Puerto Rico es una isla. Debemos tener preocupación." 3 Diario de Sesiones de la Convención Constituyente 2116 (1952). Reconociendo la precariedad de nuestros recursos, la Comisión de Disposiciones Transitorias y Asuntos Generales sobre Asuntos Generales, que preparó el camino para la redacción del Art. VI, *supra*, expresó: "Es nuestro propósito señalar con absoluta claridad la conveniencia y necesidad de que se conserven los recursos naturales en Puerto Rico. Siendo Puerto Rico una isla y teniendo pocos recursos naturales, debe haber una preocupación constante por parte del Estado en el uso, desarrollo, aprovechamiento y conservación de los mismos. La conservación de la tierra, los bosques, los peces, *las aguas*, las aves, las minas y las salinas, entre otros, debe ser una de las funciones primordiales de nuestro gobierno." (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2622 (1952).

Los forjadores de nuestra Constitución tenían meridianamente clara su visión del ser humano y su interrelación e interdependencia sistémica con los recursos naturales y con la naturaleza de la cual forma parte integral. El hombre es tanto un componente como un interactor en su medio ambiente natural, físico, social, económico y político. Esta visión integral del hombre, de su medio ambiente y de la naturaleza en general permea el principio constitucional de que todos tenemos la esperanza de un mundo mejor basado en los principios expuestos en el Preámbulo y en la Carta de Derechos de la Constitución. El medio ambiente natural y la naturaleza no sólo sirven el propósito de que el

hombre pueda utilizarlos para su subsistencia material, sino para su recreación y uso del tiempo libre, para la contemplación de su belleza y majestuosidad, para sentirse orgulloso de su patria, para mejorar su calidad de vida, y para lograr un desarrollo integral de la personalidad y su autorealización como ser humano.

La política pública sobre los recursos naturales expuesta en nuestra Constitución es una protección de lo que comúnmente llamamos "la naturaleza". Es una protección frente al Estado, la sociedad, el gobierno, e incluso el hombre, que en el mundo contemporáneo, sin darse cuenta que está socavando su propia existencia, destruye la naturaleza en aras de un materialismo y un consumismo rampante, creando desbalances sistémicos irreversibles.

El Estado mediante legislación[13] ha reiterado su compromiso con la más eficaz conservación de sus recursos en repetidas ocasiones: en la Ley sobre Política Pública Ambiental,[14] la Ley Orgánica del Departamento de Recur-

---

[13] El Prof. Luis Negrón García señaló en 1970 los problemas que existían en Puerto Rico como resultado de la carencia de legislación adecuada. Como complemento a la Ley sobre Política Pública Ambiental de 1970 se presentó legislación que sirvió de base a la Ley para la Conservación, el Desarrollo y Uso de los Recursos de Agua de Puerto Rico (en adelante Ley de Aguas de 1976). L.F. Negrón García, *Proyecto de Ley de Desarrollo de Aguas de Puerto Rico*, Río Piedras, Ed. Rev. Jur. U.P.R., 1973, págs. 15–16.

[14] En su Art. 2 dispuso:

"Los fines de este Capítulo son los siguientes: Establecer una política pública que estimule una *deseable y conveniente armonía entre el hombre y su medio ambiente*, fomentar los esfuerzos que impedirían o eliminarían daños al ambiente y la biósfera y estimular la salud y el bienestar del hombre; enriquecer la comprensión de los sistemas ecológicos y fuentes naturales importantes para Puerto Rico y establecer una Junta de Calidad Ambiental." (Énfasis suplido.) 12 L.P.R.A. sec. 1122.

En el Art. 3(a) dispuso:

"(a) El Estado Libre Asociado, en pleno reconocimiento *del profundo impacto de la actividad del hombre en las interrelaciones de todos los componentes del medio ambiente natural*, especialmente las profundas influencias del crecimiento poblacional, la alta densidad de la urbanización, la expansión industrial, recursos de explotación y los nuevos y difundidos adelantos tecnológicos y reconociendo además la importancia crítica de restaurar y mantener la calidad medio ambiental al total bienestar y desarrollo del hombre, declara que es política continua del Gobierno del Estado Libre Asociado, incluyendo sus municipios, en cooperación con las organizaciones públicas y privadas interesadas, utilizar todos los medios y medidas prácticas, incluyendo ayuda técnica y financiera, con el propósito de alentar y promover el

sos Naturales,([15]) la Ley de Aguas de 1976([16]) y el Plan de Reorganización Núm. 1 de 1993, Leyes de Puerto Rico, pág. 603.([17])

---

bienestar general, para crear y mantener las condiciones bajo las cuales el hombre y la naturaleza puedan existir en armonía productiva y cumplir con las necesidades sociales y económicas y cualesquiera otras que puedan surgir con las presentes y futuras generaciones de puertorriqueños." (Énfasis suplido.) 12 L.P.R.A. sec. 1123.

([15]) En la exposición de motivos la Asamblea Legislativa expresó:

"La complejidad que exhiben los procesos económicos y sociales de Puerto Rico en sus interrelaciones con el mundo de los recursos naturales presenta retos de enorme magnitud para todos nuestros ciudadanos.

"La magnitud de las fuerzas demográficas, económicas y geográficas que se reúnen en Puerto Rico tienden a acelerar el deterioro ambiental, ejercen grandes presiones sobre la conservación de los recursos naturales y someten a las estructuras gubernamentales existentes a serios reclamos por soluciones rápidas y efectivas a esos agudos problemas.

"Dada la actual estructuración de organismos públicos para bregar con la problemática referida, dichos reclamos generalmente trascienden los poderes y facultades de las agencias existentes, o como sucede en numerosas ocasiones, la dispersión de funciones operacionales en múltiples agencias diluye el esfuerzo gubernamental y la solución es tardía o puede no llegar.

"Lo anterior exije que se desarrolle, como complemento a la función de elaborar la política pública sobre los recursos naturales y el medio ambiente de la Junta de Calidad Ambiental de Puerto Rico, una centralización efectiva de las funciones operacionales y de implementación de reglamentos que al presente desempeñan múltiples organismos gubernamentales, con la consiguiente duplicación de trabajo y pérdida de esfuerzo y dinero." Ley Orgánica del Departamento de Recursos Naturales, Exposición de Motivos, Ley Núm. 23 de 20 de junio de 1972, Leyes de Puerto Rico 430.

([16]) El Art. 2, dispone:

"*Es política pública del Estado Libre Asociado mantener el grado de pureza de las aguas de Puerto Rico que requiera el bienestar, la seguridad y el desarrollo del país, asegurar el abasto de aguas que precisen las generaciones puertorriqueñas presentes y futuras mediante el establecimiento de áreas de reserva de aguas y aprovechar las aguas y cuerpos de agua de Puerto Rico con arreglo al interés público y a criterios de uso óptimo, beneficioso y razonables.* A estos efectos, y a propósito, además de proteger al país frente a las adversidades de la escasez, el mal uso, el desperdicio y la contaminación de tan esencial recurso, así como para lograr que su aprovechamiento sea compatible con las realidades físico-naturales en que el mismo se encuentra y con las necesidades sociales y económicas del país, se declaran las aguas y cuerpos de agua de Puerto Rico propiedad y riqueza del Pueblo de Puerto Rico. El Gobierno del Estado Libre Asociado administrará y protegerá ese patrimonio a nombre y en beneficio de la población puertorriqueña.

"*Así mismo es política del Estado Libre Asociado lograr la distribución más equitativa y justa de sus aguas. A ese efecto se establece que las necesidades de agua adscritas al consumo doméstico, y particularmente al consumo humano, deberán ser satisfechas con prelación a cualesquiera otras y que en la adjudicación del sobrante disponible el interés público deberá prevalecer frente a todo otro interés o reclamo.*" (Énfasis suplido.) 12 L.P.R.A. sec. 1502.

([17]) "Desde 1952, tras la aprobación de la Constitución de Puerto Rico, existe una política pública relacionada con la conservación, el desarrollo ambientalmente sostenible y el aprovechamiento de los recursos naturales. A tono con esta política

Durante, al menos, los últimos veinticinco (25) años, el Poder Legislativo ha provisto al Estado de una política pública amplia, clara y uniforme, y ha habilitado al Gobierno con las herramientas necesarias para cumplir con este mandato constitucional y poner en vigor la política pública plasmada en la legislación.

IV

*La Ley de Aguas de 1976*

La Ley de Aguas de 1976 (12 L.P.R.A. sec. 1501 *et seq.*) fue aprobada por la Legislatura con dos (2) propósitos en mente. El primero, y más importante, era nacionalizar las aguas del País, intención dimanante de la adopción del enfoque integral del ciclo hidrológico. La ley *declara como propiedad y riqueza del Pueblo de Puerto Rico, "[t]odas las aguas y cuerpos de agua"* —(énfasis suplido) 12 L.P.R.A. sec. 1504— de la Isla y le impone al Estado Libre Asociado *el ineludible deber de administrar y proteger las aguas de nuestro país, a nombre y en beneficio*

---

pública *se ha concedido al Departamento de Recursos Naturales, desde su creación en el 1972, la misión de manejar, proteger, conservar, desarrollar y aprovechar los recursos naturales y el ambiente de la Isla. Es [é]ste un fin primordial del gobierno ya que, por nuestro tamaño y condición de la isla, es prioritario el buen manejo de nuestros recursos y la protección del ambiente.*

"El sector de los recursos naturales y el medio ambiente comprende una serie de actividades, programas y organismos entre los que se encuentran el Departamento de Recursos Naturales, la Junta de Calidad Ambiental, la Autoridad de Desperdicios Sólidos, la Oficina de Energía y otros.

"El presente Plan de Reorganización responde a la necesidad de que todos aquellos organismos y programas cuyo objetivo principal es el desarrollo ambientalmente sostenible, utilización, aprovechamiento, protección y conservación de los recursos naturales, ambientales y energéticos de la Isla se desarrollen de una manera coordinada y eficiente dentro de una misma estructura administrativa. De otra parte, aquellos que fomentan el desarrollo de esos recursos con fines industriales, comerciales y turísticos pertenecen, por su propia naturaleza, al sector de desarrollo económico. Se reconoce asimismo que las funciones de la Junta de Calidad Ambiental son conflictivas con las anteriormente descritas, por lo que este organismo debe permanecer como uno autónomo que responda directamente al Gobernador.

"A tenor con esto, se renomina el Departamento de Recursos Naturales y se integran a éste programas que hasta ahora se encontraban fuera de la agencia." Art. 1, Plan de Reorganización Núm. 1 de 1993, Leyes de Puerto Rico, págs. 603–604.

*de la población puertorriqueña.*([18]) Obliga al Estado a "mantener el grado de pureza de las aguas de Puerto Rico que requiera el bienestar, la seguridad y el desarrollo del país, *asegurar el abasto de aguas que precisan las generaciones puertorriqueñas presentes y futuras mediante el establecimiento de reserva de aguas y aprovechar las aguas y cuerpos de agua de Puerto Rico con arreglo al interés público y a criterios de uso óptimo, beneficioso y razonables".* (Énfasis suplido.) 12 L.P.R.A. sec. 1502.

 Como parte de la política pública expresa del Estado Libre Asociado en la citada ley se dispone que se deberá "lograr la distribución más equitativa y justa de sus aguas". 12 L.P.R.A. sec. 1502. A esos efectos se declara que "las necesidades de agua adscritas al consumo doméstico, *y particularmente al consumo humano, deberán ser satisfechas con prelación a cualesquiera otras* y que en la adjudicación del sobrante disponible el interés público deberá prevalecer frente a todo otro interés o reclamo". (Énfasis suplido.) Íd.([19])

El desperdicio o el mal uso del agua, según se estableció en la Exposición de Motivos de la ley, "lesiona el bienestar y pone en riesgo la seguridad del país que, por no contar con un caudal ilimitado y bien distribuido del recurso, debe extraerle al que tiene el máximo beneficio en términos que satisfagan el interés público". Ley de Aguas de 1976, Exposición de Motivos, *supra*, pág. 412.

---

([18]) La ley adoptó el principio de la integridad del ciclo hidrológico, por ende la necesidad de incluir dentro del plan de administración todas las aguas y cuerpos de agua. En la exposición de motivos se expresó: "El propio ciclo hidrológico ... constituye ... una unidad, en vez de una sucesión de fenómenos aislados." Ley de Aguas de 1976, Exposición de Motivos de la Ley Núm. 136 de 3 de junio de 1976, Leyes de Puerto Rico, pág. 412.

([19]) El Art. 4 de la Ley de Aguas de 1976 (12 L.P.R.A. sec. 1504) claramente dispone que: "[el] uso, aprovechamiento y desarrollo [de todas las aguas y cuerpos de agua de Puerto Rico] estarán sujetos a las disposiciones de este Capítulo y de los reglamentos que se establezcan al amparo del mismo". El término "aguas y cuerpos de agua" según definidos por la referida ley "incluye las aguas superficiales, las subterráneas, las costaneras y cualquiera *otra dentro de la jurisdicción* del Estado Libre Asociado". (Énfasis suplido.) 12 L.P.R.A. sec. 1503.

La segunda intención de la ley fue descargar en el Secretario del Departamento de Recursos Naturales la responsabilidad del manejo y conservación del agua en Puerto Rico. Como tal le facultó para tomar todas las medidas necesarias para asegurar la pureza, disponibilidad y regeneración del recurso del agua, guiado por "una visión de conjunto [y] una perspectiva integradora, de nuestros problemas hidrológicos". Ley de Aguas de 1976, Exposición de Motivos, *supra.*

■ La Ley de Aguas de 1976 confiere al Secretario del Departamento de Recursos Naturales y Ambientales una serie de atribuciones y facultades necesarias para viabilizar la política pública del Estado Libre Asociado en torno a este recurso como patrimonio nacional. Véase, por ejemplo, *Arroyo López v. E.L.A.*, 126 D.P.R. 682 (1990), en el cual discutimos la obligación del Secretario de Recursos Naturales de inspeccionar y vigilar todos los cuerpos de agua de la Isla.

## V

*El Código Civil y su reglamentación de las aguas y el Departamento de Recursos Naturales*

■ La Ley de Aguas de 1976 tuvo el efecto de nacionalizar las aguas del País, derogando así aquellas disposiciones del Código Civil que permitían adueñarse de cuerpos de agua.

La Ley de Aguas de 1976, sin embargo, mantuvo vigentes algunas disposiciones del Código Civil pertinentes al uso privado de las aguas con restricciones. La ley también creó un sistema de franquicias para que entidades privadas o públicas pudieran hacer uso exclusivo (mas no absoluto) de fuentes de agua.

■ Entre los artículos de la Ley de Aguas de 1903 que quedaron vigentes se encuentran aquellos referentes a las

servidumbres legales. Estas servidumbres incluyen: la servidumbre de acueducto; la de estribo y presa; la de abrevadero y de saca de agua, y la de camino de sirga.[20]

La Ley de Aguas de 1976 también facultó al Gobierno a conceder franquicias sobre fuentes de agua, siguiendo, por supuesto, los propósitos rectores de la ley. Art. 9 de la Ley de Aguas de 1976 (12 L.P.R.A. sec. 1509).

 El nuevo Reglamento para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico Núm. 3171, Departamento de Recursos Naturales,[21] define a la franquicia como "una autorización para

---

[20] Sobre las servidumbres de agua, véanse: B. Biondi, *Las Servidumbres,* Madrid, Revista de Derecho Privado, 1978. Sobre el tema del dominio y uso público de los recursos, véase M.J. Godreau y J.A. Giusti, *Las concesiones de la Corona y propiedad de la tierra en Puerto Rico, siglos XVI-XX: un estudio jurídico,* 62 Rev. Jur. U.P.R. 351 (1993); A. Guaita, *Derecho Administrativo: Aguas, Montes Minas,* Madrid, Ed. Civitas, 1986; M. Albaladejo, *Derecho Civil,* Barcelona, Ed. Bosch, 1977, T. III, Vol. 1; S. Álvarez Gendín, *El dominio público—su naturaleza jurídica,* Barcelona, Ed. Bosch, 1956.

[21] El Reglamento, presentado en el Departamento de Estado el 30 de diciembre de 1992, fue promulgado a tenor con la Ley de Aguas de 1976 que dispone que el Secretario de Recursos Naturales y Ambientales tendrá las facultades siguientes:

"(j) Establecer un sistema de permisos y franquicias para el uso y aprovechamiento de las aguas y cuerpos de agua de Puerto Rico y fijar los derechos a cobrar en cada caso....

"(k) Reglamentar el diseño, la construcción, la operación y todo lo pertinente al cierre de instalaciones, estructuras o artefactos utilizados para extraer o alumbrar aguas subterráneas, en coordinación con otras agencias concernidas con estos asuntos.

. . . . . . . .

"(o) Promulgar, reglas de naturaleza sustantiva y procesal para la adjudicación de controversias entre particulares sobre aprovechamiento de aguas. 12 L.P.R.A. sec. 1505.

En relación con estas funciones, le compete al Secretario de Recursos Naturales y Ambientales:

"(g) mediante reglamento al efecto, establecer los derechos a pagarse por los permisos de hincado de pozos para extracción de agua subterránea en terrenos públicos y privados ... controlar el uso y extracción de las aguas subterráneas, fijar su ritmo de extracción y establecer los derechos a pagarse por el agua subterránea que se extraiga de pozos en terrenos públicos o privados." 3 L.P.R.A. sec. 155(g).

Durante 1991 a 1992 el Departamento otorgó trescientos treinta y tres (333) franquicias de aguas; concedió doscientos cuarenta y cuatro (244) permisos de hincado de pozos; vendió el sesenta por ciento (60%) de los pozos hincados en 1989 y legalizó la extracción en veintisiete por ciento (27%) de éstos. Informe de Aguas del Departamento de Recursos Naturales, 1991–1992, pág. 19.

Las facultades y deberes antes enumerados son consistentes con aquellos señalados en la Ley Orgánica del Departamento de Recursos Naturales, Ley Núm. 23 de

utilizar ciertas y determinadas cantidades de agua de una fuente en particular y no un derecho sobre una fuente en particular". Art. 8.1 del Reglamento para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico Núm. 3171, Departamento de Recursos Naturales, 13 de noviembre de 1984. Esta autorización escrita para el uso o aprovechamiento de aguas superficiales, subterráneas o costaneras "le concede a su poseedor el derecho a utilizar un volumen determinado de agua por un período de tiempo y sujeto a las condiciones allí dispuestas". Art. 1.15 del Reglamento, *supra*. Ese uso o aprovechamiento es un "[d]erecho por ley o concesión de utilizar para usos comunes o privativos, aguas de dominio público". Art. 1.7 del Reglamento, *supra*.

La doctrina coincide en que este esquema no le concede al cesionario "la propiedad de las aguas, que son y serán siempre públicas ... el concesionario adquiere un derecho real al aprovechamiento de las aguas en las condiciones que derivan de las disposiciones generales y de su concreto título concesional". Guaita, *op. cit.*, pág. 151.

El Reglamento establece detalladamente los procedimientos administrativos que rigen los usos, el aprovechamiento y la administración de las aguas de Puerto Rico. Consistente con las disposiciones de la Ley de Aguas de 1976 y de la Ley Orgánica del Departamento de Recursos Naturales, el Reglamento contiene los criterios de uso beneficioso y razonable y los criterios de uso óptimo con los cuales debe conformarse el uso de agua en Puerto Rico. Los referidos criterios "se establecen con el propósito de asegurar que en el uso de las aguas se obtenga el mayor beneficio social". Art. 5.1, Reglamento, *supra*, pág. 17.

20 de junio de 1972, según enmendada, 3 L.P.R.A. sec. 151 *et seq.*, y el Plan de Reorganización Núm. 1 de 1993, Leyes de Puerto Rico, pág. 603 (que crea el comúnmente denominado "Departamento Sombrilla").

## VI

*El derecho administrativo aplicable*

 La doctrina sobre jurisdicción primaria cobra vigencia y es de aplicación a la materia que nos ocupa, en virtud de la ley especial que regula el uso y aprovechamiento del agua en nuestro país. Las disposiciones de ley citadas establecen claramente que el Departamento de Recursos Naturales ha sido designado y facultado para dirimir las controversias relacionadas al uso y manejo de agua.

 La doctrina de jurisdicción primaria atiende la jurisdicción original para considerar una reclamación. Consiste de dos (2) vertientes: jurisdicción primaria exclusiva y jurisdicción primaria concurrente. En la primera, la ley dispone que el organismo administrativo tendrá jurisdicción inicial exclusiva para examinar la reclamación. La jurisdicción concurrente se da cuando la ley permite que la reclamación se inicie bien en el foro administrativo o en el judicial. *Aguilú Delgado v. P.R. Parking System*, 122 D.P.R. 261, 266 (1988). Véanse, también: *First Fed. Savs. v. Asoc. de Condómines*, 114 D.P.R. 426 (1983); *Ferretería Matos, Inc. v. P.R. Tel. Co.*, 110 D.P.R. 153 (1980); *Ferrer Rodríguez v. Figueroa*, 109 D.P.R. 398 (1980).

 Resolvimos en *Aguilú Delgado v. P.R. Parking System*, supra, que la doctrina de jurisdicción primaria concurrente permite la paralización de la acción judicial mientras advenga final y firme el dictamen administrativo. *Aguilú Delgado v. P.R. Parking System*, supra, pág. 268. El propósito es ceder la primacía al organismo administrativo. D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 1ra ed., Colombia, Ed. Forum, 1993, pág. 440.

 La aplicación de esta doctrina evita una inter-

vención judicial innecesaria y a destiempo que interfiera con el cauce y el desenlace normal del proceso administrativo. Como regla general no puede ser preterido el trámite administrativo a menos que existan las excepciones que han sido establecidas por la jurisprudencia. Véanse: *Rivera v. Depto. de Servicios Sociales*, 132 D.P.R. 240 (1992); *Delgado Rodríguez v. Nazario de Ferrer*, 121 D.P.R. 347 (1988); *Mercado Vega v. U.P.R.*, 128 D.P.R. 273 (1997).

En *Guadalupe v. Saldaña, Pres. U.P.R.*, 133 D.P.R. 42, 49–50 (1993), también reiteramos que "el Poder Judicial conserva la autoridad para intervenir en los momentos en que sea necesario para evitar un daño irreparable a una persona, facilitándose entonces la revisión judicial al tener los tribunales información más precisa sobre los fundamentos de la actuación gubernamental".

Desde *Borges v. Registrador*, 91 D.P.R. 112, 123 (1964), hemos interpretado que las servidumbres legales "cae[n] dentro del ámbito del derecho administrativo". Esto es así ya que "estas no constituyen propiamente verdaderas servidumbres". Íd., págs. 122–123. "Las servidumbres legales se rigen por sus leyes especiales. En el caso de las públicas, el Código es derecho supletorio y en el caso de las llamadas privadas, rige el Código pero sólo en tanto *[y] en cuanto dicho cuerpo legal no esté en conflicto con las leyes y reglamentos especiales sobre la materia. Tienen precedencia dichas leyes y reglamentos especiales.*" (Énfasis suplido.) *Borges v. Registrador*, supra, págs. 125–126.[22]

Considerando lo antes expuesto sobre la doctrina de jurisdicción primaria concurrente; el ámbito al cual pertenece la materia de la servidumbre de acueducto; la importancia del agua como recurso de las generaciones presentes

---

[22] Refiérase al resumen que se hace sobre la opinión de los tratadistas Manresa, Guaroa Velázquez, Borrell y Soler, y Puig Brutau sobre las servidumbres legales en *Borges v. Registrador*, 91 D.P.R. 112, 122–125 (1964).

y futuras de nuestro país y la política pública del Estado Libre Asociado, procede la aplicación de la Ley de Aguas de 1976 y su reglamento para dirimir controversias como la presente.

## VII

*Conclusión*

En el caso de autos, la parte demandante recurrida presentó una demanda sobre negación de servidumbre de acueducto. En lo pertinente, se alegó que "[d]entro de la finca del demandante mana [sic] del centro de su tierra un ojo de agua represado y por un tuvo [sic] va una caja recibidora y de ahí una bomba, bombea y tira el agua a otro tanque recipiente dentro de la misma finca y de este tanque por gravedad va a parar al establecimiento donde se elabora el café ...". Apéndice 3, pág. 7. Conforme alegaron los demandantes, en síntesis, los demandados —sin autorización de clase alguna— instalaron una tubería desde la caja principal, llevando el agua hasta la residencia del codemandado, Sr. Norberto Rodríguez, y de ahí se reparte a los otros codemandados.

En su contestación a la demanda, los demandados recurrentes argumentaron entre otras defensas afirmativas que habían sido autorizados voluntariamente por los demandantes a beneficiarse del agua y que ellos presenciaron personalmente la instalación de la referida tubería. La parte demandada alegó, además, que la parte demandante no tiene registrado en el Departamento de Recursos Naturales el ojo de agua, conforme exige la ley.

Surge de los autos una certificación de la Autoridad de Acueductos y Alcantarillados de que en el sector en Lares donde están ubicadas las residencias de los demandados "no existe tubería de agua potable de la agencia [...] tampoco en el área cercana a sus residencias". Apéndice 6, pág. 18. Surge además, de las declaraciones juradas sometidas

por la parte demandada, que el agua, objeto del presente caso, *es un manantial subterráneo que fue represado* por la parte demandante supuestamente en contravención con la Ley de Aguas de 1976 y que éstos habían autorizado a los demandados a servirse de dicha agua. Surge también que desde 1987 no se elabora café en la finca de los demandantes y que desde hace más de sesenta y cinco (65) años el agua fue represada *y que el barrio la utilizaba.*

De la réplica a la oposición a la sentencia sumaria surge que la parte demandante alegó que los demandados carecían de legitimación activa para solicitar una franquicia al Departamento de Recursos Naturales, por no ser dueños del terreno donde está ubicado el ojo de agua. Los demandantes alegan, además, que *tienen derecho a una franquicia y que en efecto la han solicitado.* Cabe señalar que esta última alegación contrasta con una moción sometida por esta misma parte en respuesta a una orden de mostrar causa que dirigimos a las partes para que acreditaran el estado de los procedimientos ante el foro administrativo. En la referida moción, la parte demandante recurrida informa que "nunca ha comenzado procedimiento administrativo alguno referente a este caso", por lo que no existe procedimiento administrativo pendiente o que haya sido paralizado.

En el presente caso la parte demandante reclama su derecho a ejercitar la acción de negación de servidumbre a base de su derecho propietario sobre el inmueble donde se encuentra el ojo de agua. *En ningún momento alegó ni probó que tuviese algún derecho propietario sobre el agua*, o que tuviese *algún título*, al amparo de alguna legislación anterior, *o franquicia* para extraer y aprovecharla.

Tratándose el presente caso de una acción en la cual el demandante pretende *negar* la existencia de una servidumbre de acueducto y la parte demandada *afirma* su existencia y su derecho a tal servidumbre, el tribunal tenía que corroborar primero si el demandante posee la titularidad o

el derecho (franquicia o concesión) de utilizar el agua. Al no acreditarse lo anterior, les corresponde a las partes ventilar esta controversia ante el Departamento de Recursos Naturales y Ambientales, agencia a la cual el Estado le delegó la implantación de una política pública vigorosa en protección del recurso del agua.[23]

La adjudicación de controversias no puede conducir a resultados absurdos. El agua es un elemento fundamental para la vida humana.

En resumen, erró el tribunal al declarar con lugar la demanda en el presente caso y al no aplicar la doctrina de jurisdicción primaria.

Por ello, *revocamos dicha sentencia y se dicta otra* para *ordenar al tribunal de instancia que refiera la controversia al Departamento de Recursos Naturales y Ambientales. Hasta tanto el dictamen del foro administrativo advenga final y firme, y si es que otra cosa dispone el Departamento de Recursos Naturales y Ambientales, los demandados recurrentes podrán continuar utilizando el agua.*

*Se emitirá sentencia de conformidad.*

El Juez Asociado Señor Rebollo López emitió una opinión concurrente.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

Aquellos de nosotros que hemos practicado la profesión de abogado sabemos que el abogado en la práctica, dado lo complicado de la profesión, apenas le sobra el tiempo para leer, y estudiar, las numerosas decisiones que emiten los

---

[23] Cabe señalar, además, que tratándose de agua para el consumo humano, la Ley para Proteger la Pureza de las Aguas Potables de Puerto Rico, Ley Núm. 5 de 21 de julio de 1977 (12 L.P.R.A. sec. 1551 *et seq.*), es relevante a la controversia ante nuestra consideración.

diferentes foros judiciales apelativos; cuyas decisiones tienen inherencia directa, o indirecta, sobre nuestro ordenamiento jurídico.

Es por ello que resulta lamentable que estos foros apelativos, al resolver los casos o controversias que llegan ante su consideración, emitan ponencias innecesariamente complicadas y extensas, envolviéndose en la discusión, y exposición, de temas y materias que, aun cuando interesantes e ilustrativas, no resultan ser necesarias para la correcta adjudicación del caso.

La opinión emitida por una mayoría de los integrantes del Tribunal en el presente caso es un ejemplo clásico de esa clase de decisiones, esto es, una decisión en que este Foro se envuelve en la exposición, y discusión, de una serie de temas que resultan totalmente innecesarios para la correcta solución de la controversia ante nuestra consideración.

El presente caso plantea una *sencilla* controversia de índole administrativa —relacionada con la doctrina de jurisdicción primaria— la cual, de hecho, el Tribunal la resuelve en apenas cinco (5) o seis (6) páginas. Cabe preguntarse cuál fue el propósito que tuvo el Tribunal al escribir las restantes veinte (20) páginas. No hay duda que, y a manera de ejemplo, la Parte II de la Opinión —la "importancia del recurso del agua"— y la Parte III de la misma —la "naturaleza constitucional y legal del recurso del agua"— pueden constituir un tema de gran interés para un discurso ante una de las escuelas de derecho o ante un club cívico por parte de uno de los integrantes del Tribunal. Realmente no lo sabemos. Lo que sí sabemos es que la discusión de referencia *no* era necesaria para la correcta solución de la controversia, de índole administrativa, que plantea el recurso.

Lo antes expuesto, debe quedar claro, *no* tiene otro propósito u objetivo que lograr que el Tribunal esté más a tono

con los difíciles tiempos que vivimos y que tome consciencia de que el refrán popular, a los efectos de que "lo poco agrada y lo mucho empalaga", es también de aplicación a las decisiones que emite.