

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Blas Buono Correa<br><br>　　　Peticionario<br><br>　　　　　v.<br><br>Hon. Javier Vélez Arocho;<br>Secretario del Departamento de<br>Recursos Naturales y Ambientales<br>de Puerto Rico<br><br>　　　Recurrido | Certiorari<br><br>2009 TSPR 166<br><br>177 DPR \_\_\_\_ |

Número del Caso: AC-2008-20

Fecha: 28 de octubre de 2009

Tribunal de Apelaciones:

　　　　　Región Judicial de San Juan, Panel IV

Juez Ponente:

　　　Hon. Carlos López Feliciano

Abogados de la Parte Peticionaria:

　　　Lcdo. José A. Andreu Fuentes
　　　Lcdo. Pedro J. López Bergollo

Oficina del Procurador General:

　　　Lcda. Isabel Sánchez del Campo
　　　Procuradora General Auxiliar

Materia: Mandamus

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correccione s del proceso de compilación y publicación oficial de las decisio nes del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Blás Buono Correa

    Peticionario

    v.

Hon. Javier Vélez Arocho;
Secretario del Departamento        AC-2008-20
de Recursos Naturales y
Ambientales de Puerto Rico

    Recurrido

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 28 de octubre de 2009

Este caso nos brinda la oportunidad de expresarnos en torno a los criterios a utilizar para delimitar la zona marítimo terrestre. En particular, nos corresponde evaluar si, al realizar el deslinde de la referida zona, el Departamento de Recursos Naturales y Ambientales (DRNA) puede recurrir al criterio de hasta donde llegan las mayores olas en los temporales aunque el área objeto del deslinde califique como una sensible a las mareas. Asimismo, tenemos la oportunidad de considerar si las características topográficas y geográficas del espacio a deslindar constituyen un

criterio que debe considerar el DRNA al delimitar esta zona.

El DRNA sostiene que en la tarea de realizar el deslinde de la zona marítimo terrestre se deben utilizar, en conjunto, el criterio de "hasta donde baña el mar los terrenos en su flujo y reflujo" y el de "hasta donde llegan las mayores olas en los temporales", que se recogen en la Ley de Muelles y Puertos de Puerto Rico de 1968, junto a factores bióticos y abióticos presentes en la zona de estudio. A su juicio, la conjunción de estos factores determina el límite interior de la zona marítimo terrestre. En apoyo a dicha contención el DRNA cita el *Manual de Procedimientos para el Deslinde del Límite Interior Tierra Adentro de los Bienes de Dominio Público Marítimo-Terrestre* adoptado por dicha agencia como guía para los procedimientos de deslinde de la zona.

Por el contrario, el peticionario, señor Blas Buono Correa, rechaza el argumento del DRNA y nos plantea que en aquellos lugares costeros donde las mareas son sensibles— como alega ocurre en sus terrenos— la zona marítimo terrestre es aquella parte de la costa que baña el mar en su flujo y reflujo; es decir, hasta donde llega la marea más alta, sin más.

## I.

El peticionario es el propietario de tres (3) fincas en el Barrio Aguirre, Sector Punta Arenas, en Salinas, Puerto Rico. El 18 de febrero de 2003, éste solicitó del DRNA un deslinde de la zona marítimo terrestre ya que

interesaba construir una casa de recreo en una de las fincas y necesitaba obtener los permisos correspondientes para lo que se requería ese deslinde.

Dos años más tarde, el 13 de diciembre de 2005, el Lcdo. Javier J. Rúa, Subsecretario del DRNA, le envió una carta en la que le comunicó que las fincas objeto de la petición de deslinde se encontraban completamente ubicadas dentro de la zona marítimo terrestre. No obstante, aclaró que dichas propiedades no podían considerarse de dominio público ya que habían sido adquiridas con anterioridad a la vigencia de la Ley de Aguas de 1866. El DRNA reconoció que su delimitación de la zona marítimo terrestre era sin perjuicio de los derechos adquiridos por el peticionario según reconocidos por la legislación decimonónica.

Así las cosas, el 10 de enero de 2006, el peticionario presentó un recurso de revisión ante el DRNA, al amparo del Artículo 15.5 del Reglamento 4860. Mediante dicho recurso, éste alegó, entre otras cosas, que era improcedente la delimitación de la zona marítimo terrestre mediante Mapa Preliminar pues tal mecanismo era inaplicable al caso, procediendo en su lugar un deslinde físico de los terrenos. El 10 de julio de 2006, el Secretario del DRNA, Hon. Javier Vélez Arocho, decretó el cierre de la solicitud del peticionario y emitió una orden para que la División de Agrimensura del DRNA procediera a realizar el deslinde solicitado en el término de treinta (30) días.

El DRNA no realizó el deslinde, por lo que el peticionario presentó ante el Tribunal de Primera Instancia

una petición de *mandamus*. Solicitó del tribunal que le ordenara al Secretario cumplir con su deber ministerial de realizar el deslinde de la zona marítimo terrestre.

El 14 de noviembre de 2006, se celebró una vista con antelación a la vista en su fondo. Como resultado de ello, el tribunal dictó una sentencia por "transacción en corte abierta" mediante la cual ordenó -habiéndose ello estipulado por las partes- que el Secretario del DRNA habría de concluir el deslinde de la zona marítimo terrestre en un término de cuarenta (40) días. Sin embargo, el Secretario no realizó el deslinde en el término estipulado, por lo que Buono Correa presentó una solicitud para que se le encontrara incurso en desacato civil. El Secretario se opuso a la solicitud y alegó que la zona marítimo terrestre se extendía tierra adentro más allá de los terrenos del peticionario, motivo por el cual tanto los colindantes como el municipio debían ser notificados del plano de deslinde para que tuvieran la oportunidad de impugnarlo de ser necesario.

El 28 de febrero de 2007, el foro de instancia celebró una vista de desacato en la cual le ordenó al Secretario realizar el deslinde en un término de noventa (90) días. Sin embargo, la agencia estableció que debido a la extensión y complejidad del trabajo no era posible cumplir con la encomienda en el término dispuesto por el tribunal. En virtud de ello, solicitó un plazo adicional de nueve (9) meses para completar el deslinde. El foro de instancia

denegó este término y fijó un plazo final de treinta (30) días so pena de desacato.

Luego de varios trámites procesales, se celebró una vista de desacato. Las partes presentaron sus respectivas teorías sobre el alcance de la delimitación tierra adentro de la zona marítimo terrestre. El tribunal recibió tanto evidencia testifical como documental a esos efectos. Luego de la vista las partes presentaron sendos memorandos de derecho delineando sus respectivas posiciones.

El 20 de septiembre de 2007, el Tribunal de Primera Instancia emitió una resolución en la que determinó, en lo que nos concierne, lo siguiente:

> [S]e ordena al Secretario del DRNA, a culminar el deslinde de la zona marítimo terrestre en los terrenos del demandante conforme el criterio del lugar, hasta donde el mar baña los terrenos en su flujo y reflujo, con total abstracción del criterio de las mayores olas en los temporales, y conforme al estudio de marea preparado por el agrimensor, Emilio López Rivera y aceptado como correcto por los funcionarios del DRNA.
>
> En este caso en particular donde las mareas son sensibles, no aplica lo relativo al caso donde las mareas no son sensibles por ende no hay que entrar en consideraciones de a dónde llegan las mayores olas en tiempo de temporal.

Además, el foro de instancia determinó que era correcta la posición del peticionario a los efectos de que los manglares no se consideran parte de la zona marítimo terrestre sólo por el hecho de ser manglares. Dicho foro concluyó, invocando como fundamento nuestro dictamen en *Rubert Armstrong v. E.L.A.*, 97 D.P.R. 588 (1969), que la existencia de manglares en las fincas del peticionario no

demostraba, necesariamente, que éstas se encuentran en la zona marítimo terrestre.

El Secretario del DRNA presentó un recurso de *certiorari* ante el Tribunal de Apelaciones. En su petición adujo que para delimitar la zona marítimo terrestre en los terrenos del peticionario se tiene que utilizar el criterio de "hasta donde las olas del mar bañan los terrenos en su flujo y reflujo", junto al criterio de "hasta donde llegan las mayores olas en los temporales", además de la presencia de factores bióticos y abióticos, como manglares y vegetación salitrosa, que puedan estar ubicados en los terrenos bajo estudio. Sostuvo que su posición respecto a qué constituye la zona marítimo terrestre responde a su conocimiento y pericia sobre esta materia.

El peticionario se opuso a la petición de *certiorari.* Además, solicitó la desestimación del recurso bajo el fundamento de que en éste se expresó que comparecía ante el Tribunal de Apelaciones el DRNA y no el Secretario del DRNA, quien figuró como parte demandada ante el Tribunal de Primera Instancia.

El Tribunal de Apelaciones validó la posición del DRNA de que en la delimitación de la zona marítimo terrestre en los terrenos del peticionario procede utilizar los criterios de "flujo y reflujo del mar" y de las "mayores olas en los temporales" de la Ley de Muelles y Puertos de Puerto Rico de 1968 en conjunto con los factores abióticos y bióticos presentes en dichos terrenos. El tribunal intermedio le confirió total deferencia a la determinación

del DRNA habida cuenta de que el legislador delegó en éste la prerrogativa de poner en vigor la política pública sobre la conservación de los recursos naturales. Ante la pericia de la agencia, razonó dicho foro, era improcedente la intervención judicial. Por último, el Tribunal de Apelaciones dispuso de la solicitud de desestimación presentada por el señor Buono Correa. Sostuvo que el recurso no debía desestimarse sin la previa oportunidad de enmendar la comparecencia para incluir en ésta al Secretario del DRNA.[1]

Inconforme, el peticionario recurrió ante este Tribunal mediante recurso de apelación. En síntesis, expone que erró el Tribunal de Apelaciones al otorgarle deferencia al DRNA en su posición sobre los criterios que deben regir el deslinde de la zona marítimo terrestre. El 27 de junio de 2008, acogimos el recurso como uno de *certiorari* y expedimos el auto solicitado. Ambas partes han comparecido por lo que pasamos a resolver.

---

[1] El peticionario aduce que erró el Tribunal de Apelaciones al permitir esta enmienda. En el recurso de *certiorari* presentado ante el foro apelativo intermedio se identificó en el epígrafe como demandado y peticionario al Secretario del DRNA y en la comparecencia se señaló al DRNA como la parte peticionaria. Sostenemos que esta incongruencia constituyó un error o inadvertencia excusable en las formalidades del recurso que no privó al Tribunal de Apelaciones de su jurisdicción. *Véase,* Regla 34 del Reglamento del Tribunal de Apelaciones, 4 L.P.R.A. Ap. XXII-A R. 34. Éste, claramente, no abusó de su discreción al permitir la enmienda para incluir en la comparecencia del recurso al Secretario del DRNA.

**II.**

**A**

El deslinde administrativo de la zona marítimo terrestre es sin duda una función de vital importancia para el Estado pues establece los límites del dominio público marítimo respecto las propiedades colindantes. Aun cuando el deslinde implique una declaración sobre la naturaleza física del terreno como zona marítimo terrestre, lo cierto es que "en ningún caso tiene carácter declarativo de derechos". C. Horgué Baena, *El deslinde de costas*, Madrid, Ed. Tecnos, 1995, pág. 215. Ésta es una operación jurídica y técnica que tiene como resultado materializar sobre el terreno las definiciones legales. En este tenor, la profesora Horgué Baena, *op. cit.,* pág. 228, lo describe "como un acto que se circunscribe a constatar una realidad física lo que presupone una labor de interpretación jurídica de conceptos y de las definiciones legales de los mismos y, además, una labor técnica de comprobación sobre el terreno de tales características".

Toda vez que el acto de deslindar consiste en la aplicación práctica de preceptos legales, el deslinde de la zona marítimo terrestre requiere que se determine el alcance de esta zona según se define en nuestra legislación y reglamentación. Ahora bien, cualquier discusión sobre este tema nos lleva a un entronque con el Derecho Histórico, habida cuenta que nuestra normativa sobre el litoral costero se remonta a la Ley de Aguas española de 1866. *Colección Legislativa de España*, Madrid, Tomo XCVI,

Segunda Parte, 1866, pág. 294-346. Esta legislación especial se hizo extensiva a Puerto Rico mediante la Real Orden de 8 de agosto de 1866. *Rubert Armstrong v. E.L.A., supra,* pág. 618. *Véase además, San Gerónimo Caribe Project, Inc. v. E.L.A.,* res. 31 de julio de 2008, 2008 T.S.P.R. 130, 174 D.P.R. ___,(2008). Dicha ley dio paso a la adopción de piezas legislativas posteriores que, a su vez, sirvieron de base para "configurar la legislación y reglamentos vigentes en las agencias administrativas de Puerto Rico" relativas a la delimitación de la zona marítimo terrestre. A. Lugo (editor), *Cartilla de la Zona Marítimo-Terrestre,* UPRG-B-200, Vol. 18, Núm. (1-30), 2004, pág. 23.

**B**

La Ley de Aguas de 1866 constituyó un esfuerzo por la sistematización de normas jurídicas anteriores relativas a las aguas terrestres y marítimas, con el interés de "fija[r] los derechos y obligaciones del Estado y de los particulares, prescindiendo de todo lo que pu[diese] considerarse como Reglamentario y propio del Poder ejecutivo". F. Pan Montojo (editor), *Revista de los Tribunales y de Legislación Universal, Legislación de Aguas,* 9na ed., Madrid, Ed. Góngora, [1952?], pág. 16. *Véase,* S. Martín-Retortillo, *La Elaboración de la Ley de Aguas de 1866,* 32 Rev. Adm. Púb. págs. 11-54 (1960).

La Ley de Aguas de 1866, en su Título I, proclamaba que eran de dominio nacional y uso público: las costas o

fronteras marítimas, el mar litoral, y las playas.  La

playa se define en esta ley como:

> el espacio que alternativamente cubren y
> descubren las aguas en el movimiento de las
> mareas.  Forma su límite interior o terrestre la
> línea hasta donde llegan las más altas mareas y
> equinocciales.  Donde no fueren sensibles la
> mareas, empieza la playa por la parte de tierra
> en la línea adonde llegan en las tormentas o
> temporales ordinarios.
>
> Artículo 1 de la Ley de Aguas de 1866, *supra,* pág.
> 295.

En la exposición de motivos de la citada ley se

expresó que al declarar las playas como bienes de dominio

público se persiguió el objetivo de "restablecer la

disposición de nuestras antiguas Leyes, que, de acuerdo con

las romanas, les fijaban por límite aquel dónde alcanzan

las olas del mar en sus temporales ordinarios, espacio

bastante para las necesidades de navegación y pesca...".

*Rubert Amstrong v. E.L.A.,* *supra,* pág. 620.  *Véase,* F. Pan

Montojo, *op. cit.* pág. 20.  En ese tenor, autores de la

época sostenían que la definición de "la playa", era

equivalente a lo que se había entendido en Las Partidas

como "ribera del mar" o la orilla del mar por los romanos.

M. Colmeiro, *Derecho administrativo español*, 4ta ed., T.

II, Madrid, 1876, pág. 7, citado en C. Horgué Baena, *op.*

*cit.*, pág. 30 esc. 9.  Este criterio es sostenido en la

actualidad por varios autores modernos.  *Véanse*, L.

Martínez Escudero, *Playas y Costas Su Régimen Jurídico*

*Administrativo*, 2da ed., Madrid, Ed. Montecorvo S.A., 1986,

pág. 38; L. Pérez Conejo, *Lecciones de Dominio Público*,

Universidad de Málaga, 2007, pág. 119-120 ("las playas de

1866 eran lo que los romanos llamaban 'orillas del mar' y en la época medieval se denominaban 'riberas del mar', y que se referían a toda la franja litoral y no como se le conoce en la actualidad.")

Ahora bien, la doctrina no es unánime en cuanto a este parecer. La profesora Horgué Baena, *op. cit.*, pág. 31, sostiene que la definición introdujo un criterio alternativo "que no estaba ni en los textos romanos ni en las Partidas pues,…, en éstos se atendía a las mayores crecidas del mar sin diferenciar el fenómeno –mareas o temporales— que pudiera producirla". Afirma que con la definición de playa de la Ley de Aguas de 1866 "se opera una restricción, al menos conceptual, del terreno que pudiera considerarse playa, al negarse la posibilidad [de] que mayores olas por temporales rebasaran las líneas ideales marcadas por las mareas, en donde éstas fuesen relevantes".[2] *Id*. Igual criterio expresa la profesora Desdentado Daroca ("la concepción plasmada en la Ley de 1866 es más restrictiva que la recogida anteriormente en Las Partidas…"). E. Desdentado Daroca, *La expropiación de*

---

[2] Horgué Baena fundamenta su posición en que la delimitación de las playas adoptada en la Ley de Aguas de 1866 responde al proyecto elaborado por Cirilo Franquet para el 1859, el cual sirvió de antecedente a dicha ley y "expresamente conectaba las mareas al Atlántico y refería los temporales al Mediterráneo, donde las mareas son apenas sensibles…". *Op. cit.*, pág. 31. El proyecto de Franquet, en su artículo 10 conceptuaba la playa como "todo el espacio que bañan las pleamares en el Océano y las mayores olas durante las tempestades en el Mediterráneo". *Id.*, citando a *Proyecto de un Código General de Aguas*, Madrid, Imprenta Nacional, 1859, pág. 11.

*los enclaves privados en la zona costera,* Navarra, Thomson Civitas, 2007, pág. 25.

La definición de playa, objeto de la referida discusión doctrinal, se mantuvo vigente en el ordenamiento español hasta que el Título I de la Ley de Aguas de 1866 se desgajó de ese estatuto y se convirtió, con algunas modificaciones, en la Ley de Puertos de 7 de mayo de 1880.[3] *Colección Legislativa de España*, Madrid, Tomo CXXIV, Segunda Parte, 1880, pág. 787-800. *Véanse*, L. Martínez Escudero, *op. cit.*, pág. 41; L. Pérez Conejo, *op. cit.*, págs. 119-20. Aunque la Ley de Puertos de 1880 siguió los lineamientos generales de la Ley de Aguas de 1866, introdujo varias modificaciones relevantes.[4] Entre ellas, identificó por primera vez el concepto de zona marítimo terrestre en sustitución del término playa de la Ley de Aguas de 1866. L. Pérez Conejo, *op. cit.*, págs. 119-20. *Véase*, C. Horgué Baena, *op. cit.,* pág.35.

A pesar de este cambio en los términos, la doctrina sostiene que conceptualmente la definición de la zona marítimo terrestre prescrita en la Ley de Puertos de 1880 mantuvo los criterios que imperaban bajo la definición de playa de la Ley de Aguas de 1866. C. Horgué Baena, *op. cit.,* pág. 35. *Véanse además*, L. Martínez Escudero, *op.*

---

[3] En Puerto Rico se mantuvo vigente la Ley de Aguas de 1866 hasta 1886 cuando fue sustituida por la Ley de Aguas de 13 de junio de 1879 y la Ley de Puertos de 1880.

[4] Algunas de esas modificaciones se incorporaron para ampliar la categoría de los bienes considerados de dominio público, mientras que otras para dejar establecido con mayor claridad "la posible existencia de enclaves privados en la costa". E. Desdentado Daroca, *op. cit.*, pág. 26.

*cit.,* pág. 42; E. Rivero Ysern, *Las afecciones y desafecciones naturales de la zona marítimo-terrestre en el Derecho español,* en: *Estudios en Homenaje a López Rodó,* Madrid, Vol. II, 1972, pág. 348.

La zona marítimo terrestre quedó configurada en la Ley de Puertos de 1880 como "el espacio de las costas o fronteras marítimas del territorio español que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde no lo sean. Esta zona marítimo terrestre se extiende también por las márgenes de los ríos hasta el sitio en que sean navegables o se hagan sensibles las mareas." Artículo 1 de la Ley de Puertos de 1880, *supra,* pág. 787-88. Dicha zona quedó declarada del dominio nacional y uso público, "sin perjuicio de los derechos que correspondan a los particulares". *Id. Véanse, San Gerónimo Project, Inc. v. E.L.A., supra;* C. Horgué Baena, *op. cit.,* pág. 34-35.

Puede observarse que textualmente la definición de la zona marítimo terrestre de la Ley de Puertos de 1880 refleja la existencia de dos criterios para determinar su extensión: uno de ellos para los lugares donde sean sensibles las mareas y el otro donde no lo sean. En el primero de los casos, la zona se delimitaría en función del flujo y reflujo de la marea; en el segundo, a base de hasta donde lleguen las mayores olas en los temporales. Tal distinción, sin embargo, no goza de la simplicidad que aparenta si consideramos que al ser el concepto de zona marítimo terrestre equivalente al de playa de la Ley de

Puertos de 1866, su alcance es objeto de igual discusión en la doctrina.[5]

Tras esbozar, a grandes rasgos, las distintas posiciones de la doctrina española sobre el alcance del término playa bajo la Ley de Aguas de 1866 y la zona marítimo terrestre bajo la Ley de Puertos de 1880, examinaremos el trato particular que estas leyes proveían para los espacios terrestres inundables por las aguas del mar. Asimismo, reseñaremos algunos aspectos relevantes sobre el desarrollo más reciente en la legislación española sobre costas que resultan ilustrativos en cuanto al alcance de la legislación decimonónica que le precedió.

## C

Antes de examinar las disposiciones de la Ley de Aguas de 1866 y la Ley de Puertos de 1880 relativas a los terrenos inundables por las aguas marinas, cabe referirnos a nuestras expresiones en *Rubert Amstrong v. E.L.A.* En dicho caso se inició un pleito sobre reivindicación contra el Estado Libre Asociado siendo el objeto de la controversia unos terrenos que incluían áreas cubiertas por marismas y manglares. Resolvimos que los bienes objeto de

---

[5] La profesora Horgué Baena, *op. cit.,* pág. 35, señala que debido a que el concepto playa y el de zona marítimo terrestre se refieren a un mismo espacio se mantuvo bajo ésta última el criterio alternativo del mar en su flujo y reflujo en la costa del Atlántico y las olas en los temporales en las costas del Mediterráneo. Si ambos conceptos en efecto son equivalentes, se sostendría con igual vigor la postura doctrinal que sugiere que simplemente se reafirmó el criterio unitario de lo que se consideraba "ribera del mar" o la "orillas del mar" de las Partidas y el derecho romano.

reivindicación, independientemente de que estuviesen comprendidos o no como parte de la zona marítimo terrestre, eran bienes de dominio particular pues se adquirieron como tales mucho antes de la Ley de Puertos de 1880 e inclusive antes de la Ley de Aguas de 1866.

Señalamos, entonces, que aunque asumiéramos que los terrenos "eran sensible[s] a las mareas y que con el cambio de éstas se extravasaran en ell[os] las aguas del mar, o sea, que la Parcela [objeto de la controversia] era una *marisma…*" las disposiciones de la Ley de Puertos de 1880 reconocían la titularidad privada sobre "este tipo de zona 'marítimo terrestre'". *Rubert Amstrong v. E.L.A.*, *supra*, pág. 624.

De otra parte, citando a *Pueblo v. Dimas,* 18 D.P.R. 1061, 1072 (1912)*,* afirmamos que en el ordenamiento español los manglares recibían un trato particular pues se consideraban como montes del Estado "aunque contituy[er]an terrenos inundados".[6] *Rubert Amtrong v. E.L.A.*, *supra,* pág. 629. *Véase,* Scaevola, *op. cit.*, pág. 143. Señalamos que los manglares estaban comprendidos bajo la definición de *montes* establecida por Real Decreto de 21 de abril de 1876 el cual proveía para el deslinde y conservación de los montes de la Corona existentes en Cuba Y Puerto Rico. *Rubert Amtrong v. E.L.A.*, *supra,* pág. 629-630. *Véase,*

---

[6] En virtud de las Reales Órdenes de 24 de febrero de 1838 y de 1ro de marzo de 1839 se podían calificar los montes como bienes: "de dominio particular […], comunes, propios de los pueblos y de establecimientos públicos […], y montes baldíos y realengos […] propiedad del Estado, y cuya administración corresponde, por tanto, al Gobierno". Q. M. Scaevola, *Código Civil*, Madrid, 1891, T. VI, pág. 144.

*Colección Legislativa de España*, Madrid, Tomo CXVI, 1876, pág. 359-361. Mediante dicho decreto se definieron los montes como "todos los terrenos destinados particularmente a la producción de maderas y leñas, y a las tierras de pastos no cultivadas" y se distinguía entre los "montes públicos" y "montes de particulares". *Id.* Se consideraban montes de particulares los que con justo título pertenecieran al dominio privado. *Id.*

En vista del trato que la legislación especial española otorgaba a estos bienes, rechazamos la tesis de que "los manglares o marismas de la zona marítimo terrestre [fuesen], por sólo esa condición de manglares, bienes de dominio y uso público de los de aquella naturaleza que están fuera del alcance del comercio de los hombres". *Id.,* pág. 630, citando a *Pueblo v. Dimas, supra.* Esta expresión sugiere que si bien los manglares y marismas podían ser parte de la zona marítimo terrestre ello no implica que fuesen bienes del dominio público.

Así, en *San Gerónimo Caribe Project, Inc. v. E.L.A.* citamos *Rubert Amstrong v. E.L.A* con el propósito de ilustrar la existencia de enclaves privados en la zona marítimo terrestre. Indicamos que en *Rubert Amstrong v. E.L.A* reconocimos la posibilidad de que los manglares y marismas de la zona marítimo terrestre constituyeran "propiedad y título particular", ello en virtud de las leyes especiales antes discutidas. *San Gerónimo Caribe Project v. E.L.A., supra,* citando a *Rubert Amstrong v. E.L.A., supra,* pág. 630. Es decir, no descartamos que los

manglares y marismas pudiesen estar comprendidos como parte de la zona marítimo terrestre sino que reconocimos que éstos podrían constituir enclaves privados comprendidos en esta zona en virtud de la legislación especial decimonónica.

Específicamente, la Ley de Aguas de 1866 y la Ley de Puertos de 1880 disponían que "[e]n las charcas, lagunas o estanques del agua del mar, formulados en propiedad particular, no susceptibles de comunicación permanente con aquel por medio de embarcaciones, solamente podr[ía]n pescar sus dueños sin más restricciones que las relativas a salubridad pública". Artículo 15 de la Ley de Aguas de 1866, *supra*, pág. 297; Artículo 11 de la Ley de Puertos de 1880, *supra*, pág. 790. *Véase*, E. Desdentado Daroca, *op. cit.*, pág. 28.

Además, la Ley de Aguas de 1866 prescribía que el gobierno español podía "conceder para su desecación las marismas propias del Estado o de uso comunal de los pueblos" cuando ello no resultara perjudicial para "la navegación de los ríos o conservación de los puertos". Artículo 26 de la Ley de Aguas de 1866, *supra*, pág. 299. Asimismo, se permitía la desecación de los marismas de propiedad particular tras la autorización del Estado y si ello no redundaba en perjuicio de los intereses antes indicados. *Id. Véase*, C. Horgué Baena, *op. cit.*, pág. 33; *Rubert Amstrong v. E.L.A.*, *supra*.

Posteriormente, la Ley de Puertos de 1880 estableció un mecanismo de concesiones de las marismas pertenecientes

al Estado "o del domino público" para que fuesen "desecadas, cultivadas o aprovechadas de otra manera…". Artículos 51 y 55 de la Ley de Puertos de 1880, *supra*, págs. 797-98. Además, se dispuso que para la desecación y saneamiento de las marismas declaradas terrenos insalubres se seguirían las disposiciones de la Ley de Aguas de 1866 respecto a "los terrenos pantanosos".[7] *Id.* Se permitía, en síntesis, la desecación de las marismas fuesen éstas bienes de propiedad particular o pertenecientes al Estado, si ello no incidía sobre los intereses de navegación y pesca y luego de haber obtenido el permiso correspondiente del gobierno. *Id. Véanse además,* C. Horgué Baena, *op. cit.,* pág. 37; L. Martínez Escudero, *op. cit.,* pág.152; E. Desdentado, *op. cit.,* pág. 28.

La profesora Horgué Baena, *op. cit.,* pág. 37, indica que aunque tanto la Ley de Aguas de 1866 como la Ley de Puertos de 1880 hacían referencia a las marismas, ninguna de ellas disponía qué debía entenderse comprendido bajo dicho concepto. No es hasta la Ley de 24 de julio de 1918 (conocida como Ley Cambó) sobre desecación y saneamiento que la marisma se definió en el ordenamiento español "como aquel terreno inundado por las aguas del mar que

---

[7] El Capítulo X del Título Tercero de la Ley de Aguas de 1866 indicaba que podían desecarse las lagunas o terrenos pantanosos a discreción de sus dueños. Artículo 100 de la ley de Aguas de 1866, *supra*, pág. 312. De otra parte, se establecía que en caso de que los terrenos fuesen declarados insalubres procedería forzosamente su desecación. Artículo 104 de la Ley de Aguas de 1866, *supra*, pág. 313.

permaneciese encharcado o que produjese emanaciones insalubres". *Id.,* citando el artículo 1 de la Ley Cambó.

En ese tenor, el profesor Pérez Conejo *op. cit.,* pág. 123-24, comenta que las marismas eran consideradas: espacios improductivos, focos de enfermedades infecciosas, y en general perjudiciales a la salud pública. Como consecuencia de dicha percepción se estimulaba su desaparición "mediante su desecación y saneamiento por los particulares, otorgándoles una concesión a perpetuidad o lo que es lo mismo la propiedad sobre los terrenos desecados". *Id. Véase, C.* Horgué Baena*, op. cit.,* pág. 37 esc. 26.

Avances posteriores en el campo científico propiciaron el abandono de esa concepción pues se identificaron las marismas como espacios necesarios para el desarrollo y supervivencia de especies bióticas de valor ecológico. L. Pérez Conejo, *op. cit.,* pág. 124. Dicho cambio discursivo se reflejó, a su vez, en el trato recibido por las marismas en la esfera legal. *Id*.

En el ordenamiento español, constituyó un paso en esa dirección el Reglamento en ejecución de la Ley de Costas de 26 de Abril de 1969 (Ley 28/1969), aprobado por Real Decreto 1088/1980, de 23 de mayo de 1980. Aunque dicha ley no incluía disposiciones específicas sobre las marismas, el Reglamento de 1980 declaró expresamente que éstas se encontraban incluidas en el dominio público. C. Horgué Baena, *op. cit.,* pág. 43. Ello le otorgó nuevo vigor a una controversia doctrinal que había precedido la adopción del Reglamento, referente a si las marismas "podían ser

encuadradas en la definición de zona marítimo terrestre como una parte de la misma…", aunque ello sin perjuicio de los derechos adquiridos por particulares. *Id.,* pág. 43, esc. 38.

La controversia antes indicada se disipó, al menos en el ordenamiento español, al adoptarse la Ley de Costas del 28 de julio de 1988 (Ley 22/1988).[8] Específicamente, el artículo 3 de esa ley dispuso que se considerarían incluidos en la zona marítimo terrestre "las marismas, albuferas, marjales, esteros, y en general los terrenos bajos que se inundan como consecuencia del flujo y reflujo de las mareas, de las olas o de la filtración del agua del mar". *Véase,* C. Horgué Baena, *op. cit.,* pág.58.

Al comentar este cambio, la profesora Horgué Baena indica que "[d]ifícilmente puede admitirse que en la definición de zona marítimo terrestre dada en la Ley de 1969 quedasen comprendidas todas estas realidades…". *Id.,* pág. 60. Sugiere que a lo sumo podían considerarse como parte de la zona marítimo terrestre las marismas, según disponía el Reglamento de 1980. *Id.* Es decir, la inclusión de dichos espacios en la zona marítimo terrestre constituyó una expansión de la definición provista en la Ley de Costas de 1969 que mantenía, a su vez, la definición decimonónica de la zona marítimo terrestre al conceptuarla

---

[8] Surge de la Exposición de Motivos de esa ley su objetivo de mantener bajo el dominio público "los espacios naturales que reúnan las características del medio, [y] además establecer los mecanismos que favorezcan la incorporación de terrenos al dominio público, ampliando la estrecha franja costera que actualmente tiene esta calificación demanial". C. Horgué Baena, *op. cit.,* pág. 57.

como el espacio litoral: "que baña el mar en su flujo y reflujo, en donde sean sensibles las mareas, y las mayores olas en los temporales ordinarios, en donde no lo sea." Artículo 1 de la Ley de Costas de 1969, *supra*. *Véase,* C. Horgué Baena, *op. cit.,* pág. 41.

Sobre la inclusión de terrenos inundados por las aguas del mar como parte de la zona marítimo terrestre, citamos *in extenso* la siguiente distinción elaborada por el profesor Pérez Conejo:

> Hemos de diferenciar la zona marítimo-terrestre en sentido genuino o auténtico de la zona marítimo-terrestre por extensión. La diferencia estriba en la permanencia o no del agua en su contacto con la tierra. Así, la zona marítimo terrestre en sentido auténtico comprende la zona del mar que fluye y refluye, no quedándose estancada en la tierra (zona terrestre-marítima). Por su parte, se considera zona marítimo-terrestre por extensión a la superficie comprendida por las marismas, las albuferas, los marjales, los esteros, y los terrenos bajos inundables de vez en cuando. Se trata, en definitiva, de terrenos bajos que son inundados periódicamente por las aguas del mar o del viento marino y en los que el agua permanece estancada (zona marítima-terrestre).
>
> *Op. cit.,* pág. 123.

Así pues, la legislación española incluyó como parte de la zona marítimo terrestre ciertos terrenos inundados periódicamente por las aguas del mar aunque éstos no se encuentren expuestos de forma continua al flujo y reflujo de las mareas. Éste no constituye el único ámbito expansivo de la legislación española pues, además, se incorporaron las playas como bienes de dominio público.

Las leyes españolas sobre costas de 1969 y 1988 incluyeron las playas como una clase adicional de bien de

dominio público. Dicho concepto, no obstante, se reintegra con una acepción claramente distinta a la que se le atribuía en la Ley de Aguas de 1866. La Ley de Costas de 1969 definió las playas como: "las riberas de mar o de las rías formadas por arenales o pedregales en superficie casi plana, con vegetación nula o escasa y característica". Artículo 1 de la Ley de Costas de 1969, *supra.*

Sostiene Horgué Baena que dicha definición: "contemplaba una clase diferenciada de bien demanial, en la medida en que sólo se tenía en cuenta las características del terreno,[…], sin vincularlo a la acción de oleaje". *Op. cit.,* pág. 42. Bien podría ocurrir que los espacios que corresponden a la playa coincidan en ciertas áreas con los espacios comprendidos bajo la definición de zona marítimo terrestre, aunque la playa podría exceder la extensión de terreno configurado como zona marítimo terrestre o viceversa. *Id. Véase,* L. Martínez Escudero, *op. cit.,* pág. 47-48.

**D**

A diferencia de España, donde se han suscitado cambios significativos en la legislación sobre costas, en Puerto Rico continuaron vigentes las disposiciones de la Ley de Puertos de 1880 tras el cambio de soberanía hasta la aprobación de la Ley de Muelles y Puertos de 1968, Ley núm. 151 de 28 de junio de 1968, según enmendada, 23 L.P.R.A. secs. 2101 *et seq. Véanse, San Gerónimo Project, Inc. v. E.L.A., supra; López Sobá v. Fitzgerald,* 130 D.P.R. 46 (1992). Surge de la Exposición de Motivos de la Ley de

Muelles y Puertos de 1968, que ésta se adoptó con el objetivo de reglamentar la navegación y el tráfico marítimo de las aguas navegables de Puerto Rico, sus puertos y muelles y con el objetivo de conferir a la Autoridad de Puertos el control y administración de estas aguas "para beneficio del Pueblo de Puerto Rico en interés de la navegación y el comercio…".

Esta ley no alteró la definición de zona marítimo terrestre proveniente de la legislación decimonónica y esta zona quedó descrita por el legislador como:

> el espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales en donde las mareas no son sensibles, e incluye los terrenos ganados al mar y las márgenes de los ríos hasta el sitio en que sean navegables o se hagan sensibles las mareas; y el término, sin condicionar, significa la zona marítimo terrestre de Puerto Rico.
>
> Artículo 1, Sección 1.03 de la Ley de Muelles y Puertos de 1968, *supra*, 23 L.P.R.A. 2103 (n).

La citada definición se incorporó en iguales términos en el Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos bajo éstas y la Zona Marítimo-Terrestre (Reglamento 4860) promulgado por el DRNA, el 29 de diciembre de 1992, el cual rige el deslinde de esta zona.[9] Aunque el Reglamento 4860 adoptó textualmente la definición de zona marítimo terrestre provista en la Ley de

---

[9] Igual definición la encontramos en el Reglamento de Zonificación de 2000 promulgado por la Junta de Planificación y el Reglamento de Zonificación de la Zona Costanera y de Acceso a Playas y Costas de Puerto Rico de 1983, también promulgado por la Junta de Planificación.

Muelles y Puertos de 1968, el trasfondo legal bajo el cual se promulgó esta pieza reglamentaria no se limita a esta ley ni a la legislación española previamente discutida.

Antes bien, al promulgarse el Reglamento 4860, el DRNA tuvo ante sí un amplio desarrollo legislativo en el área ambiental, cuya consideración resulta fundamental para la controversia que nos ocupa. Dicha legislación está cimentada en la política pública ambiental establecida en la Constitución de Puerto Rico sobre la más eficaz conservación de nuestros recursos naturales. Veamos.

## III.

Ante la necesidad imperante de la conservación de nuestro entorno ambiental, la Constitución de Puerto Rico estableció como política pública "la más eficaz conservación de los recursos naturales, así como el mayor aprovechamiento de los mismos para el beneficio general de la comunidad...". Art. VI, Sec. 19, Const. E.L.A., L.P.R.A. Tomo 1. *Véanse, Misión Ind. P. R. v. J.P.,* 142 D.P.R 656, 676 (1997); *Paoli Méndez v. Rodríguez*, 138 D.P.R. 449, 460 (1995). En repetidas ocasiones, hemos afirmado que la citada disposición constitucional no constituye sólo "la expresión de un insigne afán" ni se reduce "a un mero postulado de principios". *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. 908, 919-20 (1998); *Paoli Méndez v. Rodríguez, supra,* pág. 460, citando a J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan Ed. U.P.R., 1982 Vol. III, pág. 235. "Se trata, más bien, de un *mandato* que obliga a todos los componentes del Estado y

prevalece sobre cualquier estatuto, reglamento u ordenanza que sea contraria a éste". *Misión Ind. P.R. v. J.C.A, supra,* pág. 919. (Énfasis en el original.) Más aún, hemos afirmado que la política pública ambiental establecida en la Constitución de Puerto Rico "fija de modo incuestionable el criterio jurídico primordial para juzgar la validez o interpretar el significado de cualquier norma o decisión relativa al uso o protección de los recursos naturales formulada por la Asamblea Legislativa o por cualquier agencia, departamento, municipio o instrumentalidad gubernamental". *Id.,* pág. 919-20.

A casi dos décadas de haberse establecido el referido mandato, éste fue reafirmado por la Asamblea Legislativa al adoptar la Ley sobre Política Pública Ambiental, Ley núm. 9 del 18 de junio de 1970 (Ley núm. 9),[10] 12 L.P.R.A. 1121 *et seq.* (ed. 2003). *Municipio de Loíza v. Sucesión Marcial Suárez*, 154 D.P.R. 333, 348 (2001). *Véanse además*, *Misión Ind. P. R. v. J.C.A., supra,* pág. 920; *Paoli Méndez v. Rodríguez, supra,* pág. 462. Como una respuesta al problema del marcado deterioro ambiental y los riesgos que éste ya representaba para la salud y el bienestar general de la comunidad, la Asamblea Legislativa afirmó "la importancia crítica de restaurar y mantener la calidad medio ambiental al total bienestar y desarrollo del [ser humano]…".

---

[10] La Ley núm. 9 fue sustituida por la Ley Núm. 416 de 22 de septiembre de 2004, 12 L.P.R.A. 8001 *et seq*. No obstante, al momento de adoptarse el Reglamento 4860 estaba vigente la Ley núm. 9. La Ley Núm. 416 mantuvo esencialmente las disposiciones de la Ley núm. 9 a las cuales hacemos referencia.

Artículo 3 de la Ley núm. 9, 12 L.P.R.A. 1123 (ed. 2003). A través de la Ley núm. 9 se sostuvo como política pública el utilizar todos los mecanismos disponibles para promover las condiciones que permitiesen la coexistencia armónica entre el ser humano y su medio ambiente. *Id.* Como medio para cumplir con la política pública trazada se afirmó, entre otras medidas, la responsabilidad del Estado de "preservar los importantes aspectos históricos, culturales y naturales de nuestro patrimonio…" y "asegurar para todos los puertorriqueños paisajes seguros, saludables, productivos y estéticos y culturalmente placenteros". *Id.*

Además, la Ley núm. 9 exigió que los departamentos, las agencias, las corporaciones públicas, los municipios y las instrumentalidades del Estado interpretaran, implementaran y administraran todas las leyes y cuerpos reglamentarios del país "en estricta conformidad" con la política pública antes enunciada. Artículo 4 de la Ley núm. 9, 12 L.P.R.A. sec. 1124 (ed. 2003). *Véase además*, *Misión Ind. P.R. v. J.C.A., supra,* pág. 921. *Municipio de Loíza v. Sucesión Marcial Suárez, supra*, pág. 348.

Otro estatuto mediante el cual el Estado, a través de la Asamblea Legislativa, "ha reiterado su compromiso con la más eficaz conservación de los recursos naturales" es, precisamente, la Ley Orgánica del Departamento de Recursos Naturales y Ambientales, Ley núm. 23 del 20 de junio de 1972, 3 L.P.R.A. 151 *et seq.* *Paoli Méndez v. Rodríguez, supra,* págs. 462-63. Dicha ley le impuso al DRNA la responsabilidad de implementar "en lo que respecta a la

fase operacional" la política pública ambiental contenida en la Constitución de Puerto Rico. Artículo 3 de la Ley núm. 23, 3 L.P.R.A. sec. 153. Por su parte, al Secretario del DRNA se le confirió la facultad de aprobar aquella reglamentación necesaria para llevar a cabo los objetivos de la ley. Artículo 5 de la Ley núm. 23, 3 L.P.R.A. sec. 155(d).

La ley orgánica del DRNA delegó a dicha agencia la facultad y el deber de "[e]jercer la vigilancia y conservación de las aguas territoriales, los terrenos sumergidos bajo ellas y la zona marítimo-terrestre […]". Artículo 5 de la Ley núm. 23, 3 L.P.R.A. sec. 155 h. Además, mediante el artículo 6 de la Ley núm. 23, 3 L.P.R.A. sec. 156, se transfirieron al DRNA ciertas facultades que previamente correspondían al Departamento de Transportación y Obras Públicas (DTOP) en virtud de la Ley núm. 6 de 29 de febrero de 1968. La citada Ley núm. 6 estableció el Área de Prevención de Inundaciones y de Conservación de Playas y Ríos como una división del DTOP. 12 L.P.R.A. sec. 255. Esta Área de Prevención ejercía, entre otras, las siguientes funciones: el estudio y control de las inundaciones; la vigilancia, conservación, limpieza y control de erosión de las playas; el deslinde y saneamiento de la zona marítimo-terrestre; y la vigilancia y atención de los manglares pertenecientes al Estado. Sección 2 de la Ley núm. 6, 12 L.P.R.A. 255 a.

Entendemos que el legislador, al transferir al DRNA dichas facultades, reflejó su preocupación de que estas

funciones se ejercieran en armonía con las exigencias de conservación y preservación que esta agencia viene obligada a implementar. Estimamos, pues, que tal actuación legislativa no constituyó un mero ejercicio accidental sino el reconocimiento patente de la necesidad de llevar a cabo el deslinde de esta zona en estricta conformidad con la política pública ambiental que el DRNA está obligado a implantar.

Luego de haber adoptado la Ley núm. 23 la Asamblea Legislativa aprobó la Ley de Vigilantes de Recursos Naturales y Ambientales, Ley Núm. 1 del 29 de junio de 1977, 12 L.P.R.A. 1201 *et seq.* Esta medida legislativa, nuevamente, enfatizó la política pública sobre "la más eficaz preservación y conservación de los recursos naturales de Puerto Rico, patrimonio y riqueza de nuestro pueblo". Artículo 2 de la Ley de Vigilantes de Recursos Naturales y Ambientales, 12 L.P.R.A. 1202. En vías de implementar dicha política pública, la Asamblea Legislativa afirmó la necesidad de establecer un cuerpo de vigilantes adscrito al DRNA para promover la "protección, supervisión, conservación, defensa y salvaguarda de los recursos naturales". *Id.*

La Ley de Vigilantes de Recursos Naturales y Ambientales incluyó entre sus disposiciones la siguiente definición del término zona marítimo terrestre:

> El espacio de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde las mareas no son sensibles e incluye los terrenos ganados al mar y las

márgenes de los ríos, hasta el sitio en que sean navegables o se hagan sensibles las mareas; y el término sin condiciones significa la zona marítimo-terrestre de Puerto Rico, según se define en las leyes aplicables.

Artículo 3 de la Ley de Vigilantes de Recursos Naturales y Ambientales, 12 L.P.R.A. 1203(i).

Como puede observarse, la Ley de Vigilantes reprodujo en torno a esta zona la definición que surge de la Ley de Muelles y Puertos de 1968. Una definición que tiene sus orígenes en un contexto físico, social e histórico marcadamente distinto, pero que se ha reproducido y mantenido esencialmente inalterada en piezas legislativas aún vigentes en nuestro ordenamiento.

Así pues, el esquema estatutario vigente al momento de aprobarse el Reglamento 4860 mantenía una definición cuyos orígenes se remontan a una legislación decimonónica enfocada en la administración de la zona marítimo terrestre conforme a los intereses comerciales y económicos de la época. No obstante, la interpretación que de esta definición se realice en la actualidad debe estar, necesariamente, enmarcada en la política pública ambiental que rige en nuestro ordenamiento y exige la conservación y preservación de la zona marítimo terrestre como recurso natural de gran valor ecológico, sociocultural y ambiental. El DRNA tiene el deber ineludible de ejercer las facultades que ostenta concernientes a esta zona, entre ellas su deslinde, de manera cónsona con la política pública ambiental que rige en nuestro ordenamiento. Dentro de este marco legal se promulgó el Reglamento 4860.

**IV.**

La sección 1.2 del Reglamento 4860 señala como base legal para su adopción la obligación que le impone al DRNA la Ley núm. 23 de implantar la política pública sobre la más eficaz conservación de nuestros recursos naturales. Asimismo, alude a los deberes y facultades que le confiere la citada ley en torno a la vigilancia, conservación, saneamiento y deslinde de la zona marítimo terrestre. *Id.*

El Reglamento 4860 identifica como uno de sus objetivos principales establecer los criterios y mecanismos necesarios para cumplir las responsabilidades antes indicadas. Sección 1.3 del Reglamento 4860. Se resalta en la declaración de propósito de esta pieza reglamentaria que es responsabilidad del DRNA, además de delimitar la zona marítimo terrestre, el "asegurar su integridad y adecuada conservación, adoptando, en su caso, las medidas de protección y restauración adecuadas". *Id.*

Ahora bien, el Reglamento 4860 puntualiza que la definición de la zona marítimo terrestre según configurada en la Ley de Muelles y Puertos de 1968, *supra,* no responde a las necesidades contemporáneas de conservación y preservación.[11] *Id.* En ese tenor, el Reglamento 4860 señala

---

[11] El Reglamento 4860 sostiene dicha definición al disponer en su sección 2.108 que constituye la zona marítimo terrestre: "el espacio de las costas del Estado Libre Asociado de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles las mareas, y las mayores olas en los temporales, en donde las mareas no son sensibles, e incluye los terrenos ganados al mar, las accesiones y aterramientos que ocasiona el mismo y los márgenes de los ríos hasta el sitio en que sean navegables o se hagan sensibles las mareas. El término, sin

que la definición vigente responde a intereses imperantes en otro contexto histórico y social por lo cual "no satisface la realidad natural, ni exigencias contemporáneas de conservación, preservación y saneamiento…".[12] *Id.*

Así pues, en la declaración de propósito de este reglamento el DRNA afirmó la necesidad de atemperar "expresiones legales históricas con realidades naturales y científicas contemporáneas". *Id.* En ese tenor, el Reglamento precisó los criterios que deben ser considerados al delimitar la zona marítimo terrestre.

Primeramente, se dispuso en la sección 1.4 del Reglamento 4860 que se consideraría un bien de dominio público:

> La ribera del mar, y de las rías, que incluye la zona marítima-terrestre, determinada mediante deslinde o delimitación certificada por el Departamento, a tenor con los criterios establecidos en los artículos 3 ó 15. **Se considerarán incluidas en esta zona aquellas marismas, manglares, pantanos, y, en general, los terrenos bajos que se inundan como consecuencia del flujo y reflujo de las mareas.**

condicionar, significa la zona marítimo terrestre de Puerto Rico".

[12] En el artículo 2 del Reglamento 4860 se definen estos términos de la siguiente manera: 1) conservación – "concepto de planificación y manejo que implica la guarda, protección, defensa, control y utilización limitada de un sector considerado como un recurso natural, cultural o ecológico, con el propósito de mantener sus condiciones y características naturales"; 2) preservación – "concepto de planificación que implica el cuidado y protección de un sector designado como un recurso natural, cultural, o ecológico único o importante, con el propósito de mantener su condición y características únicas y especiales, con el fin ulterior de estudiarlo y contemplarlo en forma restringida, limitada y controlada"; 3) saneamiento – "conjunto de acciones dirigidas a mejorar las condiciones existentes en un lugar y encaminadas a eliminar aquellas que afectan adversamente los recursos existentes en el mismo".

[…]

(Énfasis suplido.)

En iguales términos, la sección 2.17 del Reglamento 4860 indica que la zona marítimo terrestre "incluye aquellas marismas, albuferas, marjales, estuarios, y en general, los terrenos bajos que se inundan como consecuencia del flujo y reflujo de las mareas con su lecho y subsuelo". Podemos observar, que el Reglamento adoptó como parte de la zona marítimo terrestre los espacios que se incorporaron expresamente a ésta en España a través de la Ley de Costas de 1988.

De otra parte, el Reglamento aclara, en la sección 1.5, que se excluyen de su aplicación los terrenos de dominio particular que estén enclavados en la zona marítimo terrestre, aunque aplican a éstos las disposiciones del Reglamento 4860 relativas a su deslinde. La sección 3.1 del Reglamento 4860, aplicable al presente caso, dispone que el deslinde de la zona marítimo terrestre se realizará de oficio o a petición de parte interesada y será certificado por el Secretario del DRNA. Exige, la sección 3.2 del citado reglamento, que toda petición de deslinde incluya "la información necesaria para establecer la demarcación histórica tierra adentro de dicha zona".[13]

---

[13] La citada sección 3.2 precisa que en aquellas áreas en que exista evidencia de que las playas, riberas y orillas del mar se han alterado mediante acción humana, el DRNA debe presumir: "que el límite histórico tierra adentro de la zona marítimo-terrestre es aquel más distante tierra dentro que pueda determinarse haciendo referencia a

En segundo lugar, la sección 3.3 del Reglamento establece que al efectuar un deslinde, además de la información histórica requerida, el DRNA podrá tomar en consideración otros factores. Específicamente prescribe que:

> [e]n aquellos lugares de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles la mareas, se considerarán también los rasgos topográficos y geográficos del lugar, tanto históricos como actuales, incluyendo, sin limitarse a la presencia de dunas, manglares, marismas, marjales y albuferas, rías, playas, entre otros.[14]

Esta sección del Reglamento 4860 realiza una enumeración aún más extensiva que la incluida en las secciones 1.4 y 2.17 antes citadas, pues incluye, además, como elementos a considerar las dunas y las playas, entre otros. En particular, las playas se definen en la sección 2.73 del Reglamento, en términos similares que la Ley de Costas de 1969 de España, como la "ribera del mar o del océano formada de arena no consolidada, ocasionalmente

---

estudios topográficos e hidrográficos, planos de autorizaciones, concesiones, licencias, franquicias o permisos anteriores, mapas o cartas de mareas o navegación.[…]

[14] El artículo 2 del Reglamento provee las siguientes definiciones: 1) duna – "promontorio de arena fina, con o sin vegetación, transportada en las playas por acción del viento"; 2) manglares – "formación vegetal propia de las zonas litorales tropicales compuesta por especies de árboles que generalmente poseen órganos accesorios de respiración que les permiten colonizar terrenos sujetos a intrusiones de agua salada"; 3) "marisma – terreno bajo y pantanoso que se inunda con las aguas del mar"; 4) marjales – "terrenos pantanosos"; 5) albufera – "laguna formada por la creciente del mar"; 6) rías – "entrante marítimo debido a la anegación, por parte de las aguas marinas, de la zona baja de algunos valles fluviales. Ensenada amplia."

grava o pedregales, en superficies casi planas, con pendiente suave, con o sin vegetación característica".

Tras enunciar los factores topográficos y geográficos antes indicados, el Reglamento establece un método subsidiario para determinar los límites de la zona, en lugares en donde son sensibles las mareas, cuando no esté disponible la información histórica o actual sobre las características geográficas y topográficas antes reseñadas. En tales instancias, la sección 3.3 dicta que el DRNA debe considerar toda la información disponible "con énfasis particular en las mareas equinocciales".[15]

Por último, la sección 3.3 el Reglamento 4860 prescribe que en aquellos lugares en los que la marea no sea sensible el DRNA podrá utilizar, además de la información histórica que tenga disponible, aquella información generada mediante modelaje matemático, y estudios computadorizados realizados por el DRNA u otras agencias estatales o federales.

De las secciones antes citadas surgen varios criterios que evidentemente inciden sobre la definición histórica de la zona marítimo terrestre. Ello según afirma el DRNA responde a la necesidad de atemperar su interpretación a las exigencias actuales de conservación y preservación.

Al adoptar el Reglamento 4860 el DRNA, primeramente, sostuvo un criterio dual para establecer los límites de la

---

[15] Se definen las mareas equinocciales como el "flujo y reflujo del mar que baña las riberas durante la época del año en la primavera y en el otoño en que el sol, pasando por el Ecuador da a la noche igual duración que el día". Sección 2.59 del Reglamento 4860.

zona marítimo terrestre. Se distingue entre los criterios para precisar los límites de la zona marítimo terrestre "[e]n aquellos lugares de las costas de Puerto Rico que baña el mar en su flujo y reflujo, en donde son sensibles la mareas" y otros para los espacios litorales "donde las mareas no son sensibles". Sección 3.3 Reglamento 4860.

Además, el citado reglamento precisó que en las costas de Puerto Rico donde las mareas son sensibles deben considerarse los rasgos topográficos y geográficos del lugar. En ausencia de información histórica o actual sobre estos rasgos, entonces, se delimitará la zona marítimo terrestre haciendo énfasis particular en las mareas equinocciales.

Así pues, el Reglamento 4860 no dispone que "las olas en los mayores temporales" constituye un factor a considerar al delimitar la zona marítimo terrestre en las costas de Puerto Rico donde las mareas son sensibles. Por el contrario, reafirmó que dicho criterio aplica en aquellos espacios litorales donde las mareas no son sensibles. En consonancia con ello, la sección 1.4 del Reglamento 4860 señala que son parte de la zona marítimo terrestre los acantilados que estén en contacto con el mar o con dicha zona "hasta el nivel más alto alcanzado por las olas en tormenta".

En suma, en su interés de atemperar y esclarecer la definición de la zona marítimo terrestre provista por la legislación vigente, el Reglamento 4860 sostuvo un criterio dual para delimitar esta zona pero, a su vez, precisó que

el DRNA no debe pasar por alto las características topográficas y geográficas que refleje el espacio sobre el cual se realizará el deslinde, en aquellos lugares donde sean sensibles las mareas.

Ello nos obliga a considerar si el DRNA, al incorporar por vía de reglamentación los rasgos topográficos y geográficos enunciados, los cuales no se encuentran especificados en la legislación vigente, actuó dentro de sus facultades de reglamentar o si, por el contrario, su actuación fue *ultra vires*. Examinemos los principios del derecho administrativo que, en lo referente a este último aspecto, deben regir nuestra función revisora.

**V.**

**A**

Las agencias administrativas ostentan la facultad que, en su caso, le delegue la Asamblea Legislativa para adoptar reglas de carácter legislativo cuyos efectos trasciendan a la comunidad en general.[16] *Caribe Comms., Inc. v. P.R.T.Co.,* 157 D.P.R. 203, 211 (2002). *Véanse además*, *Asoc. Fcias. Com. v. Depto. de Salud*, 156 D.P.R. 105, 130-32 (2002); *J.P. v. Frente Unido Pro Defensa del Valle de Lajas*, 165 D.P.R. 445, 469-70 (2005). Expone el profesor Demetrio Fernández, "que la acción de reglamentación de la agencia va dirigida precisamente a darle contenido y

---

[16] En el derecho administrativo, "[u]na regla legislativa es la que crea derechos, impone obligaciones y establece un patrón de conducta que tiene fuerza de ley." *Asoc. Fcias. Com. v. Depto. de Salud, supra,* pág. 146, citando a *Mun. de San Juan v. J.C.A.,* 152 D.P.R. 673, 692 (2000).

fijarle precisión a la política pública que se le ha encomendado a la agencia implantar". Demetrio Fernández Quiñones, *Derecho Administrativo y la Ley de Procedimiento Administrativo Uniforme,* 2da ed. rev.*,* Bogotá, Ed. Forum*,* (2001), pág. 110.

Al promulgar un reglamento, las agencias deben cumplir estrictamente los requisitos que establece la ley para viabilizar la participación ciudadana en el proceso decisional administrativo y posibilitar así la expresión de aquellos cuyos intereses podrían verse afectados a raíz de la actuación administrativa. *Asoc. de Fcias. Com. v. Depto. de Salud*, *supra,* págs. 131-32. Se requiere para la validez procesal de una norma reglamentaria que ésta se promulgue en cumplimiento con los procedimientos pautados por la ley orgánica de la agencia o por las leyes especiales. *Id.*, pág. 130

De otra parte, la validez de una reglamentación está sujeta, en términos sustantivos, a que: (1) se le haya delegado a la agencia el poder de reglamentar; (2) la actuación administrativa esté autorizada por ley (3) la reglamentación promulgada esté dentro de los amplios poderes delegados; y (4) la reglamentación no sea arbitraria o caprichosa. *M.& B.S., Inc. v. Depto. Agricultura*, 118 D.P.R. 319, 326 (1987). *Véanse además, Asoc. de Fcias Com. v. Depto. de Salud, supra*, pág. 130; *Carrero v. Depto. de Educación,* 141 D.P.R. 830, 837 (1996); *Luan Investment Corp. v. Román*, 125 D.P.R. 533, 550 (1990).

Según surge de los criterios esbozados, primeramente, al determinar la validez de una regla de carácter legislativo es indispensable examinar si en su adopción la agencia excedió los poderes y facultades que le fueron delegados. Para dicho análisis recurrimos a la ley habilitadora como "mecanismo legal [mediante el cual se] le delega a la agencia los poderes necesarios para actuar de conformidad con el propósito legislativo". *Amieiro González v. Pinnacle Real Estate Group*, res. del 26 de marzo de 2008, 2008 T.S.P.R. 52, págs. 8-9, 173 D.P.R.___(2008). *Véase además, Caribe Comms., Inc. v. P.R.T.Co., supra*, pág. 211.

Así, el ejercicio de nuestra función revisora requiere que precisemos si la actuación de la agencia se ajusta al poder delegado y a la política establecida por la Asamblea Legislativa. *Véase, Comisionado de Seguros de P.R. v. P.R.I.A.*, 168 D.P.R. 659,667 (2006). En ese tenor, la reglamentación para ser válida debe estar "de acuerdo con las disposiciones estatutarias bajo las cuales se promulgó". *Carrero v. Depto. de Educación, supra*, 837. *Véanse además, P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 409 (1980)*; Asoc. Fcias. Com. v. Depto. de Salud, supra.*

Como un último criterio para determinar la validez sustantiva de una norma reglamentaria debe considerarse si ésta adolece de arbitrariedad o irracionabilidad. *Franco Dominicci v. Depto. de Educación*, 148 D.P.R. 703, 712 (1999). *Véase además, Carrero v. Depto. de Educación,*

*supra*, págs. 837-38. Hemos reiterado que se considera inválida una regla que merezca la calificación de arbitraria o caprichosa por carecer de conexión racional con el estatuto que autoriza su creación. *Id.*

Así pues, el ejercicio de reglamentar presupone la previa consideración e interpretación por parte del organismo administrativo del estatuto o la política pública cuya implementación le ha sido encomendada. La irracionabilidad o arbitrariedad como elementos para dilucidar la validez sustantiva de una norma reglamentaria implican cierta deferencia a la construcción normativa que, mediante reglamentación, el organismo administrativo realice en torno a la legislación cuya implementación le corresponde.[17] Ello descansa en la noción de que las agencias administrativas, dada la especialidad que se les atribuye, están en posición de adoptar reglas que se ajusten adecuadamente a la política pública o a la ley que se les ha encomendado aplicar.

**B**

Expuestos los requisitos para la validez sustantiva de una regla legislativa, recalcamos que una vez un organismo administrativo adopta una norma reglamentaria está obligado

---

[17] Sobre este particular señala el profesor Frank Cross, que desde una perspectiva pragmática, se justifica la deferencia a los organismos administrativos bajo la premisa de que éstos: "'may adjust their interpretations to new facts, policies, and even political values.' A deference doctrine thus represents a pragmatic recognition of the ability of agencies to discern the statutory interpretation most in the public interest." F. Cross, *The theory and practice of statutory interpretation*, California, Stanford University Press, 2009, pág. 111.

a observarla estrictamente pues la misma opera como límite a su discreción. *Com. Vec. Pro-Mej., Inc. v. J.P.*, 147 D.P.R. 750, 764-65 (1999). *Véanse además*, *García Cabán v. U.P.R.*, 120 D.P.R. 167, 175 (1987); *T-Jac, Inc. v. Caguas Centrum Limited Partership,* 148 D.P.R. 70, 81 (1999). En ese tenor, hemos sido enfáticos en que una vez una agencia promulga una norma reglamentaria "debe cumplirla y aplicarla en la manera en que está concebida, sirviendo siempre a los propósitos, los objetivos y la política pública que la forjaron". *T-JAC, Inc. v. Caguas Centrum Limited, supra,* pág. 81.

Como norma general, las agencias administrativas interpretan y aplican en primera instancia las leyes y los reglamentos cuya administración le corresponde. *Com. Vec. Pro-Mej., Inc. v. J. P., supra,* 761. En el ejercicio de dichas funciones los organismos administrativos están en mejor posición de "armonizar los propósitos [de la legislación], con las situaciones de día a día". *Id.*

No obstante lo anterior, las agencias "no pueden simplemente eliminar sus reglamentos y reinstalarlos, sin el beneficio del proceso de reglamentación, a través de reglas interpretativas" o amparándose en el conocimiento especializado que se le atribuye.[18] *Asoc. Fcias. Com. v. Depto. de Salud, supra,* pág. 148-149. Ello lesionaría la

---

[18] Las reglas interpretativas no pueden estar reñidas con normas establecidas mediante el proceso de reglamentación. *Asoc. Fcias. Com. v. Depto. de Salud*, *supra*, pág. 146. Una regla interpretativa no tiene fuerza de ley pues se limita a "clarificar o dar uniformidad a procedimientos internos" de la agencia. *Id.*

garantía de una participación adecuada por parte de aquellos cuyos intereses se verían afectados por la norma que se pretende implantar eludiendo el proceso de reglamentación. Sobre este aspecto en *López Leiro v. E.L.A.*, res. del 25 de enero de 2008, 2008 T.S.P.R. 8, pág. 8-9, 173 D.P.R.___ (2008), expusimos lo siguiente:

> Los reglamentos administrativos crean un estado de Derecho que protege a quienes actúan bajo sus disposiciones. Las agencias administrativas, por tanto, no pueden ignorar sus propias reglas y fundamentar sus actos en una autoridad interpretativa superior debido a su particular experiencia. Por esto, las interpretaciones que las agencias realicen de sus propios reglamentos deben ampararse en la razón y en la afinidad con sus leyes habilitadoras.

(Citas internas omitidas.)

Permitir que las agencias actúen al margen de los reglamentos que promulgan, alterando sus disposiciones bajo el pretexto de reglas interpretativas o al amparo de la experiencia que se les atribuye, sería dotar a los organismos administrativos de una discreción ilimitada, lo cual ha sido rechazado firmemente por este Tribunal. *Asoc. Fcias. Com. v. Depto. de Salud, supra.*

**VI.**

A la luz de la discusión que antecede, debemos determinar si actuó correctamente el Tribunal de Apelaciones al revocar la orden mediante la cual el Tribunal de Primera Instancia ordenó que el Secretario del DRNA certificara el deslinde de la zona marítimo terrestre utilizando, únicamente, como base para ello unos estudios de marejadas. A su vez, debemos evaluar si es sostenible

la posición del DRNA, avalada por el foro apelativo intermedio, de que procede considerar en conjunto los criterios de "las mareas en su flujo y reflujo" y "las mayores olas en los temporales" para establecer los límites de la zona marítimo terrestre. De otra parte, nos corresponde resolver si el DRNA puede recurrir a los rasgos topográficos y geográficos enunciados en el Reglamento 4860 para establecer los lindes de dicha zona a pesar de que éstos no se contemplan expresamente en la definición legislativa vigente. Recordemos que la sentencia recurrida también sostuvo la posición del DRNA en cuanto a este último aspecto.

Enfatizamos que la presente controversia se centra en el alcance de una definición que se incorporó en la legislación española del siglo 19 con el propósito de salvaguardar los intereses imperantes en dicho contexto social e histórico. La definición de la zona marítimo terrestre ha sido ampliamente abordada por la doctrina española desde una perspectiva histórica con el propósito de dilucidar el alcance de sus distintos componentes. Así, la doctrina acude a la intención del legislador español de siglo 19 con la aspiración de esclarecer de manera afín a la misma los distintos conflictos que se suscitaban en torno a esta zona del litoral costero.

No obstante, no debemos circunscribirnos a un análisis relativo a la génesis de la definición de la zona marítimo terrestre bajo el fundamento de que ésta se mantiene en nuestro ordenamiento según se configuró en la legislación

decimonónica. Limitar nuestro análisis a dicha dimensión textual e histórica tendría el efecto impermisible de soslayar la política pública ambiental actual establecida por la Constitución de Puerto Rico y firmemente reiterada por la Asamblea Legislativa.

No podemos resolver esta controversia a espaldas de la política pública ambiental dispuesta en la Constitución de Puerto Rico, cuando esta Alta Curia ha reiterado que su expresión constituye un mandato para todos los componentes del Estado. Tampoco podemos resolver la controversia que nos ocupa ignorando que la Asamblea Legislativa ha reafirmado con vigor la necesidad "crítica" de la más eficaz conservación de nuestros recursos naturales, imponiéndole a las agencias del Estado el deber de implementar, administrar e interpretar sus leyes y reglamentos de forma que se asegure el cumplimiento con la misma.

El Reglamento 4860 constituye, precisamente, el esfuerzo del DRNA de ejercer los deberes que le impone su ley orgánica cumpliendo, a su vez, con su función de implementar la política pública ambiental. Coincidimos con el DRNA en que el alcance que le atribuya dicha agencia a la definición de la zona marítimo terrestre debe, necesariamente, atemperarse a las necesidades de conservación y preservación de la misma, pues de lo contrario su actuación contravendría la política pública cuya implementación le encomendó la Asamblea Legislativa.

Ahora bien, la construcción normativa que el DRNA realizó a través de su facultad de reglamentar no puede exceder el ámbito del poder que le ha sido delegado. Examinemos si las disposiciones aplicables del Reglamento 4860 son sostenibles a la luz del poder de reglamentación delegado mediante la Ley núm. 23.

Un análisis de las secciones pertinentes del Reglamento 4860 demuestra que a través de éste el DRNA sostuvo, sin duda alguna, un criterio dual para establecer los límites de la zona marítimo terrestre. El Reglamento distingue entre los factores que deben ser considerados en los deslindes que se realicen en los espacios costeros donde son sensibles las mareas y aquellos aplicables donde no lo sean. En cuanto a este aspecto el DRNA reprodujo textualmente la distinción contemplada en la definición de la zona marítimo terrestre vigente en la legislación. Por consiguiente, no podemos afirmar que tal proceder constituyó una actuación *ultra vires* por parte de este organismo administrativo.

El DRNA no puede descansar en reglas interpretativas ni en el conocimiento especializado que se le atribuye para adelantar una posición que claramente contravendría lo dispuesto en el Reglamento 4860. En ese tenor, el DRNA no puede descansar en el *Manual de Procedimientos para el Deslinde del Límite Interior Tierra Adentro de los Bienes de Dominio Público Marítimo-Terrestre* para sostener su posición de aplicar conjuntamente el criterio de "las mayores olas en los temporales" en lugares donde son

sensibles las mareas. Ello contravendría lo prescrito en el Reglamento 4860 el cual opera como límite a la discreción de la agencia.

De otra parte, el Reglamento 4860 dispone que al realizar el deslinde de la zona marítimo terrestre, en aquellas costas de Puerto Rico donde son sensibles las mareas, debe tomarse en consideración la información histórica y actual sobre los rasgos topográficos y geográficos del espacio en el cual se lleva a cabo el deslinde. En ausencia de esta información se delimitará la zona en función de las mareas equinocciales.

Al considerar las definiciones que el Reglamento 4860 provee para los rasgos topográficos y geográficos que deben considerarse al deslindar la zona marítimo terrestre, identificamos que comparten el elemento de que son formaciones naturales que dependen de la acción directa, aunque no ininterrumpida, de la marea o el agua del mar. El elemento común entre los espacios enumerados es que éstos —con excepción de las playas y las dunas— calificarían como "terrenos bajos que se inundan" por acción directa de la marea o del agua del mar. Por su parte, las playas y las dunas constituyen otros factores tan estrechamente vinculados a la zona marítimo terrestre que deben ser considerados al momento de determinar sus límites. Así lo estableció el DRNA al aprobar el Reglamento 4860, ejerciendo su conocimiento especializado.

Recordemos que el elemento rector al adoptar esta reglamentación lo fue el interés de atemperar la definición

de la zona marítimo terrestre a los adelantos científicos, la política pública ambiental y las necesidades actuales de conservación y preservación de la zona marítimo terrestre. El DRNA estimó, amparándose en su conocimiento especializado y el desarrollo del conocimiento científico, que la inclusión de los factores antes mencionados resulta indispensable para la conservación e integridad misma de la zona. Así lo señaló el Tribunal de Apelaciones en la sentencia recurrida al sostener que el Reglamento 4860 se adoptó al amparo de el avance en las ciencias y la tecnología, según el criterio experto de la agencia.

Concluimos que la inclusión de dichos factores constituyó un ejercicio válido por parte del DRNA de la facultad de reglamentar que le delegó la Asamblea Legislativa mediante la Ley núm. 23.[19] Sostenemos que el DRNA, al adoptar dicha reglamentación, actuó dentro del marco de la política legislativa expresada en su ley orgánica. Además, afirmamos que la reglamentación examinada no es arbitraria o caprichosa pues no descansa en

_____

[19] Es preciso puntualizar que la sección 3.3 del Reglamento 4860 no incluye una enumeración taxativa de los factores topográficos y geográficos que puede considerar el DRNA al realizar el deslinde de la zona marítimo terrestre. En esta ocasión nos limitamos a examinar si es válida la consideración de los factores expresamente incluidos en la sección 3.3. Queda para una ocasión futura el examen sobre la validez de otros factores que, en circunstancias particulares, el DRNA determine necesario considerar al establecer los límites de la zona marítimo terrestre. La validez de cualquier otro factor dependerá de que el DRNA no exceda el ámbito de los poderes que le han sido delegados y de que su aplicación no adolezca de arbitrariedad o irracionabilidad. Mediante su facultad reglamentadora el DRNA no puede arribar a resultados insostenibles bajo la normativa antes expuesta.

propósitos desvinculados de la política pública y legislativa sobre la conservación y preservación de los recursos naturales que viene llamado a poner en vigor el DRNA en virtud de la Ley núm. 23. Más bien, el DRNA ejerció su facultad de reglamentar en función de las necesidades imperantes de conservación y preservación de la zona marítimo terrestre como un recurso natural de gran valor ecológico según lo requiere su ley orgánica.

Si bien sostenemos la validez sustantiva de la norma reglamentaria que establece la consideración de factores topográficos y geográficos para delimitar la zona marítimo terrestre, a los fines de asegurar su integridad y conservación, advertimos que el DRNA no puede incurrir en arbitrariedad o irracionabilidad en la aplicación de los mismos.

Al aplicar lo expuesto al presente caso, resolvemos que el DRNA no puede utilizar simultáneamente los criterios de "el mar en su flujo y reflujo" y "las mayores olas en los temporales" al delimitar la zona marítimo terrestre en los terrenos del peticionario pues ello implicaría ir en contra de su propia reglamentación. Más bien, le corresponde al DRNA determinar si los terrenos del señor Buono Correa son sensibles a las mareas, en cuyo caso deberá utilizar los criterios pautados para dichos casos y no recurrir al criterio de las mayores olas en los temporales. Este último criterio se reserva para las costas de Puerto Rico donde las mareas no son sensibles.

Nos resta dilucidar el planteamiento del peticionario en lo referente a si los manglares pueden considerarse parte de la zona marítimo terrestre. La sección 2.57 del Reglamento 4860 define los manglares como formaciones vegetales capaces de "colonizar terrenos anegados sujetos a intrusiones de agua salada". Sostenemos que de una interpretación conjunta de esta sección y las secciones 1.4, 2.17 y 3.3 del Reglamento 4860 surge que los manglares se considerarán parte integral de la zona marítimo terrestre en tanto se inunden como consecuencia de la acción del oleaje o del agua del mar. Así lo sostuvo el Tribunal de Apelaciones al interpretar que la definición de manglares prescrita en el Reglamento 4860 sugiere la existencia "de una vinculación directa del área de mangle con el oleaje marino". Coincidimos con lo anterior y reafirmamos que en tanto el DRNA determine que los manglares de los terrenos del señor Buono Correa están sujetos a la acción directa –aunque no ininterrumpida– del oleaje o del agua del mar, deben considerarse parte integral de la zona marítimo terrestre.

Tras determinar la validez sustantiva de los factores establecidos en el Reglamento 4860, concluimos que erró el Tribunal de Primera Instancia al ordenar que el DRNA certificara el deslinde de la zona marítimo terrestre, únicamente considerando los estudios de marejadas. El DRNA debe considerar los rasgos topográficos y geográficos de los terrenos del peticionario a los fines de realizar el deslinde de la referida zona.

De otra parte, sostenemos que no incidió el foro primario al disponer que el DRNA no debe utilizar de forma conjunta los criterios del "mar en su flujo y reflujo" y "las mayores olas en los temporales". El DRNA debe aplicar dichos criterios en estricta conformidad con lo dispuesto en el Reglamento 4860.

En suma, sostenemos que al adoptar el Reglamento 4860 el DRNA actuó cumpliendo con el deber que le impone la exigencia de la más eficaz conservación de la zona marítimo terrestre como un recurso natural de trascendental valor ecológico, estético y cultural. Consecuentemente, el DRNA debe llevar a cabo el deslinde de esta zona en estricta conformidad con el Reglamento 4860.

## VII.

En virtud de los pronunciamientos que anteceden, confirmamos la sentencia recurrida en tanto ésta revocó la orden mediante la cual el Tribunal de Primera Instancia ordenó al Secretario del DRNA certificar el deslinde sólo en función del estudio de marejadas sometido por el peticionario. Modificamos la determinación del foro apelativo a los efectos de aclarar que el DRNA debe realizar el deslinde de la zona marítimo terrestre en estricta conformidad con el Reglamento 4860 por lo que no procede que utilice conjuntamente los criterios del "mar en su flujo y reflujo" y "las mayores olas en los temporales". Devolvemos el caso al Tribunal de Primera Instancia para trámites posteriores compatibles con lo aquí resuelto.

Se dictará sentencia de conformidad.


Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Blás Buono Correa

    Peticionario

    v.

Hon. Javier Vélez Arocho;
Secretario del Departamento         AC-2008-20
de Recursos Naturales y
Ambientales de Puerto Rico

    Recurrido


SENTENCIA

San Juan, Puerto Rico, a 28 de octubre de 2009

    Por los fundamentos expresados en la Opinión que antecede, los cuales se incorporan íntegramente a la presente, se dicta sentencia confirmando la sentencia recurrida en tanto ésta revocó la orden mediante la cual el Tribunal de Primera Instancia ordenó al Secretario del DRNA certificar el deslinde sólo en función del estudio de marejadas sometido por el peticionario. Modificamos la determinación del foro apelativo a los efectos de aclarar que el DRNA debe realizar el deslinde de la zona marítimo terrestre en estricta conformidad con el Reglamento 4860 por lo que no procede que utilice conjuntamente los criterios del "mar en su flujo y reflujo" y "las mayores olas en los temporales". Devolvemos el caso al Tribunal de Primera Instancia para trámites posteriores compatibles con lo aquí resuelto.

    Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta emite una Opinión concurrente y disidente. El Juez Asociado señor Rivera Pérez concurre con el resultado sin opinión escrita. La Jueza Asociada señora Pabón Charneco no interviene.


              Aida Ileana Oquendo Graulau
           Secretarial del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Blás Buono Correa
    Peticionario

                                    *Certiorari*

        v.
                            AC-2008-20

Hon. Javier Vélez Arocho,
Secretario del Departamento
de Recursos Naturales y
Ambientales de Puerto Rico
        Recurrido


Opinión Concurrente y Disidente emitida por la JUEZA ASOCIADA SEÑORA FIOL MATTA


En San Juan, Puerto Rico, a 28 de octubre de 2009.

En este recurso se hace necesario interpretar la Ley de Muelles y Puertos de 1968, <u>infra</u>, una ley anticuada, desfasada y elaborada para aplicarse en otro contexto social, económico, temporal y geográfico, totalmente ajeno a nuestras realidades físicas, jurídicas y sociales. Ello nos impone la obligación, como adjudicadores, de utilizar los instrumentos que no ofrece el ordenamiento para interpretar el texto de manera que propenda a la protección del bien común. Ese es, a fin de cuentas, y por definición, el propósito de toda legislación.

La primera definición de la zona marítimo terrestre con posterioridad a la Constitución del

Estado Libre Asociado de Puerto Rico, surge de la Ley de Muelles y Puertos, Ley Núm. 151 de 28 de junio de 1968. 23 L.P.R.A. secs. 2101 *et seq.* A su vez, la definición que allí se recoge es una reproducción directa de la Ley de Puertos española, hecha extensiva a Puerto Rico por decreto real en 1886, es decir, a finales del siglo XIX. La exposición de motivos de la Ley de Muelles y Puertos de 1968 nos ilustra que el propósito primordial de esta ley no es la protección de las costas ni la seguridad pública, sino asegurar el tráfico marítimo en interés del comercio y la administración de las aguas navegables, los muelles y las zonas portuarias. Además, al revisar los poderes generales de la Autoridad de Puertos sobre las aguas y zonas portuarias y la facultad de delimitar aquella parte de la zona marítimo terrestre que deba formar parte de la zona portuaria, notamos que tampoco denota interés en la conservación de las playas ni asigna valor alguno a la seguridad pública.[20] 23 L.P.R.A. secs. 2202 y 2601.

La creación del Departamento de Recursos Naturales y Ambientales (DRNA) y la transferencia a éste de las facultades de delimitar y proteger la zona marítimo terrestre, entre otras, dio un giro importante a la aplicación de la Ley de Muelles y Puertos pues evidenció

---

[20] Incluso, la facultad de delimitar la zona marítimo terrestre pertenecía al Secretario del Departamento de Transportación y Obras Públicas. Dicha facultad, así como el estudio y control de inundaciones y el poder de manejar y conservar las playas, fue transferida al Departamento de Recursos Naturales mediante la propia ley habilitadora de dicha agencia. 3 L.P.R.A. sec. 156(c).

el compromiso del estado con el cumplimiento del mandato constitucional de procurar la más eficaz conservación de nuestros recursos naturales. Además, como bien señala la mayoría, la Ley sobre Política Pública Ambiental, la cual pauta con más especificidad en qué consiste este mandato constitucional, requiere de toda instrumentalidad del estado, "al máximo grado posible, interpretar, aplicar y administrar todas las leyes y cuerpos reglamentarios vigentes y los que en el futuro se aprueben en estricta conformidad con la política pública enunciada". Art. 4 de la Ley Núm. 416 de 22 de septiembre de 2004 (12 L.P.R.A. sec. 8001a(b)).

Estoy completamente de acuerdo con la Opinión del Tribunal en cuanto afirma que la interpretación que se haga de la definición anticuada de zona marítimo terrestre debe ser cónsona con nuestra política ambiental de rango constitucional, la cual procura la conservación y preservación de las costas y la sustentabilidad de nuestro ambiente natural y urbano. Por ende, estoy conforme con el análisis hermenéutico que utiliza la mayoría para validar la consideración de nuevos criterios incorporados en el reglamento del DRNA, los cuales están ausentes en la Ley de Muelles y Puertos, para recontextualizar la ley conforme la nueva importancia que se le otorga a la conservación de la zona marítimo terrestre.

Sin embargo, los mismos fundamentos que permiten a la mayoría interpretar la ley y el reglamento con miras a

validar el uso de factores que la ley específicamente no contempla para delimitar la zona marítimo terrestre, sirven de autoridad para dar una lectura distinta a la ley, más a tono con las necesidades de conservación y seguridad pública. Desde esta óptica, concluyo que el Secretario no viene obligado a utilizar, en todo caso, el llamado "criterio dual" al que se aferra la mayoría. En cuanto a este aspecto de la Opinión del Tribunal, disiento.

La interpretación de la mayoría limita la facultad del Secretario del DRNA de ejercer sus funciones de acuerdo a su peritaje al hacer un deslinde. Con ello obvia, primeramente, que la manera en que debe realizarse un deslinde no surge de la ley, sino de la facultad delegada al Secretario del DRNA, por su conocimiento especializado, de llevar a cabo una tarea de naturaleza extremadamente técnica.

La información que el agrimensor del DRNA debe considerar al momento de hacer un deslinde se encuentra en el artículo 3 del reglamento del DRNA. En particular, el artículo 3.2 dispone que

> …el Departamento podrá hacer uso o requerir el uso de estudios, planos, mapas, fotos, modelos de computadora y documentos sobre la zona marítimo terrestre **o el movimiento de las olas o, marejadas en las costas de Puerto Rico** preparados por agencias e intrumentalidades gubernamentales locales y federales, tales como, pero sin limitarse a, el Departamento de Transportación y Obras Públicas, la Administración federal de Manejo de Emergencia ("FEMA", por sus siglas en inglés), el U.S. Geológical Survey (U.S.G.S.), el Negociado de

> Meteorología y otros. Reglamento Núm. 4860,
> <u>supra</u>, págs. 28-29.

Este artículo permite el uso de modelajes de olas y marejadas para medir la zona marítimo terrestre, sin hacer distinción entre las costas sensibles a las mareas y aquellas que no lo sean.

La disposición reglamentaria siguiente, que se cita en la opinión del Tribunal, es la que la mayoría interpreta para concluir que el reglamento establece el criterio dual. No obstante, mi apreciación de dicho articulado es otra, basada en la lógica más que en el análisis textual.

En primer lugar, no podemos pasar por alto que al referirse a la distinción entre las áreas sensibles a mareas y las que no lo son, el Reglamento utiliza un lenguaje **directivo**, no mandatorio y ciertamente no excluyente de las facultades periciales del Secretario. Según el párrafo introductorio del artículo 3.3:

> **Además** de la información de documentos y factores indicadores en la sección anterior, al efectuar un deslinde **se podrá** tomar en consideración lo siguiente… (Énfasis nuestro.)

Tomando en consideración lo anterior, me parece evidente que los criterios científicos para identificar el límite tierra adentro de la zona marítimo terrestre se mencionan como aplicables a las costas sensibles a las mareas porque es en esas costas que se pueden apreciar los rasgos geográficos y topográficos señalados.[21] Por otro

---

[21] Así, por ejemplo, no hay dunas ni mangles en la parte superior de un acantilado.

lado, el reglamento no excluye expresamente la aplicación de los elementos topográficos y geográficos para llevar a cabo un deslinde en los lugares que no son sensibles a las mareas. Más bien, se destaca el método de deslindar la zona marítimo terrestre en estos lugares utilizando el criterio de "las mayores olas en los temporales" por la misma razón científica, es decir, porque probablemente en estos lugares no podrá percibirse por los sentidos ningún rasgo geográfico o topográfico que indique hasta dónde se extiende el terreno que debe protegerse. Por eso el reglamento se refiere a modelaje matemático y estudios de computadora.

Toda vez que el deslinde no es una declaración sobre los derechos al terreno, sino una operación que sirve para describir la realidad física de la costa, la discreción de la agencia para hacer un deslinde, guiada por el fin de protección de la costa y de las comunidades costeras no se debe coartar. De nuevo, la mayoría utiliza este razonamiento para avalar el uso de los criterios topográficos y geográficos para hacer un deslinde, sin distinciones por la sensibilidad del área a las mareas, pero se niega a reconocer el efecto contrario a este razonamiento de la aplicación mecánica del criterio dual.

Este criterio dual, que la opinión del Tribunal explica en detalle, se incorporó a la Ley de Aguas española en 1866 y se hizo extensivo a Puerto Rico ese mismo año. Luego, según explicamos, se incorporó a la Ley

de Muelles y Puertos de 1968.[22]   En ninguna de esas ocasiones, se hizo estudio científico alguno para adecuar la disposición española a nuestra realidad física. No obstante, los estudios científicos sostienen que hay una diferencia crucial entre las costas españolas y las nuestras.

España tiene dos tipos claramente distinguibles de costas.  Geográficamente, las costas españolas se dividen entre las del Mediterráneo, donde apenas son sensibles las mareas, y las del Atlántico. C. Horgué Baena, El deslinde de costas, Editorial Tecnos, S.A., Madrid, 1995, pág. 186. En las costas españolas del Atlántico las mareas alcanzan **hasta cinco metros** y la zona costanera es, por tanto, claramente "sensible" a las mareas.  Mientras, en las costas mediterráneas el movimiento usual de las mareas oscila entre **50 centímetros** y **dos metros**, por lo cual se clasifican como micro-mareas ("microtidal").[23]   Sin

---

[22] También fue incluido en la Ley de Muelles y Puertos de Puerto Rico, Ley Núm. 59 del 30 de abril de 1928.

[23] Véanse los estudios oceanográficos reseñados en D. López Feliciano, Análisis de la definición de "zona marítimo terrestre" en Puerto Rico: Hacia una nueva definición, 42 Rev. Jur. U.I.P.R. 451, 473 (2008). Véase, C. Horgué Baena, El deslinde de costas, Editorial Tecnos, S.A., Madrid, 1995, pág. 31.

embargo, en invierno en estas costas ocurren "temporales".[24] D. López Feliciano, Análisis de la definición de "zona marítimo terrestre" en Puerto Rico: Hacia una nueva definición, 42 Rev. Jur. U.I.P.R. 451, 477 (2008). Los dos criterios de la Ley de Aguas española respondieron a esta realidad física.[25] Son interesantes, en este sentido, las sentencias del Tribunal Supremo español que se refieren a deslindes en las costas del Mediterráneo y aquellas que consideran deslindes en las costas del Atlántico, en cuanto claramente avalan el criterio dual **en atención al área geográfica particular**. Véanse, las sentencias reseñadas en López Feliciano, supra, págs. 465-469.

Puerto Rico, sin embargo, está en una zona tropical en la que el comportamiento del océano Atlántico es muy diferente al de las zonas templadas. Más aún, según los datos ofrecidos en los informes del DRNA, todas las mareas que bañan nuestras costas son también micro-mareas, toda vez que no exceden, en promedio, de 35 centímetros, es

---

[24] Aunque cotidianamente utilizamos la palabra "temporal" para referirnos a los fenómenos que abaten nuestras costas tropicales, la realidad es que los temporales que ocurren en el invierno en las costas mediterráneas no son comparables con los nuestros pues nunca alcanzan las características de los huracanes tropicales. López Feliciano, supra, págs. 471 y 477.

[25] Incluso en Francia, país que comparte con España el hecho de que sus costas se dividen entre el Mediterráneo y el Atlántico, también se reconocía el flujo y reflujo como norma general para delimitar los terrenos de dominio público, exceptuando las costas mediterráneas, donde las mayores olas en los temporales invernales sería el criterio imperante, perpetuando de esta manera la definición del *litus maris* del Derecho Justineano. Horgué Baena, *op. cit.*, pág. 186.

decir, un pie. Véase, "Manual de procedimiento para el deslinde del límite interior tierra adentro de los bienes de dominio público marítimo terrestre" del DRNA, revisado en septiembre de 2005, pág. 28.[26]

Si el parámetro de medición de la zona marítimo terrestre en España se condicionó a la perceptibilidad de las mareas, dada la naturaleza distinguible de sus dos tipos de costas, lo más consecuente es que en Puerto Rico se utilice un criterio basado en la naturaleza homogénea de nuestras costas, es decir, igualmente adecuado a nuestra realidad. **Todo ello nos lleva a la necesidad de respetar las conclusiones del DRNA basadas en su conocimiento especializado**. Además, como bien señala la Lcda. López Feliciano, el concepto de "marea sensible" es un "concepto jurídico indeterminado" y, por tanto, una cuestión técnica o científica. López Feliciano, <u>supra</u>, pág. 470.

Según los datos del mismo DRNA, un 77% de la población y 40% de nuestros suelos urbanos se ubican en municipios costeros, en donde se encuentra gran parte de nuestra infraestructura comercial y de servicios. Véase el artículo "Retos y riesgos en el manejo de las áreas

---

[26]Para un estudio más detallado sobre esta temática, refiérase a la Ponencia denominada "Sobre el Concepto de Marea "Sensible" versus "No Sensible" en la Definición de la Zona Marítimo-Terrestre en Puerto Rico: Una Verdad Inconveniente", presentada por el Prof. Aurelio Mercado Irizarry el 1 de octubre de 2009 en la Segunda Jornada de Derecho Civil Eduardo Vázquez Bote.

costeras" de Ernesto L. Díaz, Administrador de Recursos Naturales, en la Revista de aniversario del Programa de manejo de la zona costanera, publicada en junio de 2007.[27] Por ello, la interpretación de la ley y del reglamento no debe hacerse ignorando la vulnerabilidad de las costas, lo expuestas que quedan las comunidades costeras a los riesgos naturales y el deber del estado de prevenir la pérdida de vidas y propiedades. Interpretar la definición de zona marítimo terrestre de otra forma sería permitirle al estado poner en riesgo la seguridad física y económica de todos nuestros ciudadanos.

Las herramientas legales para implementar las estrategias que protegerían al país se integran a través de la buena planificación y de los ejercicios de interpretación a tenor con este deber del estado. Entre los reglamentos que viabilizan la implementación de la política pública está el Reglamento para el aprovechamiento, vigilancia, conservación y administración de las aguas territoriales, los terrenos sumergidos bajo ésas y la zona marítimo terrestre, del DRNA, supra, y los reglamentos de planificación sobre la zonificación de la zona costera y de acceso a las playas y sobre áreas especiales de riesgos a inundación. Estos esfuerzos ofrecen oportunidades para incorporar las consideraciones de protección a las comunidades costeras, vidas,

---

[27] Disponible en: http://www.drna.gobierno/pr/oficina/arn/recursosvivientes/costasreservasrefugio/pmzc/publicaciones/ (última visita en septiembre 2009).

propiedades y los mismos recursos naturales que nos sirven de infraestructura verde para amortiguar la fuerza de los fenómenos naturales que frecuentemente azotan la isla.

Tampoco podemos abstraernos del efecto práctico de deslindar adecuadamente el límite interior tierra adentro de la zona marítimo terrestre para identificar correctamente las zonas costeras susceptibles a inundaciones.

El Programa Nacional de Seguro Contra las Inundaciones (NFIP, por sus siglas en inglés) identifica las áreas susceptibles a inundaciones en todo el territorio de Estados Unidos, incluyendo a Puerto Rico. Véase, "National Flood Insurance Act", 42 USC sec. 4001 *et seq*; 44 CFR 64.3. El programa lo administra una agencia adscrita a la Agencia Federal de Manejo de Emergencias (FEMA, por sus siglas en inglés). Las entidades que procuren participar del programa deberán comprometerse con el gobierno federal a regular el uso de sus terrenos inundables. Para ser elegible a participar de las ayudas federales que FEMA administra, en Puerto Rico se promulgó el Reglamento Núm. 13 de Planificación, el cual reglamenta el manejo de estos terrenos susceptibles a inundaciones. Véanse, Boletín Administrativo Núm. OE-2005-79 y la Resolución Núm. JP-RP-13-6-2005 de la Junta de Planificación de 8 de abril de 2005.

Entre la regulación federal aplicable, resalta el "Coastal Barrier Resources Act" de 1982, 16 USC sec. 3501 *et seq.* Con el fin de reducir la pérdida de vidas, el

daño que causa a los recursos naturales y el gasto innecesario de fondos federales, dicha ley retira las ayudas federales a nuevos desarrollos en las áreas que fueran identificadas como "hazardous coastal areas". En otras palabras, estas áreas designadas como barreras costeras no cualifican para los seguros de inundaciones.[28] Véase, 42 USC sec. 5172; 44 CFR, Subcapítulo B, Parte 71, "Implementation Of Coastal Barrier Legislation".

Es mi criterio que la política pública ambiental no resiste distinciones al momento de proteger las costas y, consecuentemente, la seguridad pública y la de las comunidades y propiedades privadas costeras, como también el acceso a las playas y la debida preservación, conservación y saneamiento de la zona marítimo terrestre. Por el asunto de tan alto interés público que hoy atendemos, este Tribunal debe recordar que no debemos realizar nuestra función interpretativa "meramente a través del manejo lógico de conceptos normativos". Opinión disidente del Juez Asociado Fuster Berlingeri en <u>López y otros v. Porrata y otros</u>, 156 D.P.R. 503, 524 (2002). Aun los textos gramaticalmente más claros se vuelven oscuros con el pasar de los años si no se adecúan a la realidad en la que habrán de operar.

Dicho lo anterior, me parece evidente que no permitir al Secretario del DRNA deslindar nuestros terrenos costeros a base de criterios científicos que

---

[28] Además, se prohíbe el uso de fondos federales para la construcción de carreteras o infraestructura dentro de estas zonas.  16 USC sec. 3504.

verdaderamente salvaguarden nuestra primera línea de defensa contra los fenómenos naturales típicos de nuestro entorno tropical, puede costarnos mucho en términos económicos y de vidas humanas. Bajo el claro mandato de nuestra Constitución venimos obligados a interpretar la Ley de Muelles y Puertos de manera que asegure un futuro sustentable a nuestras futuras generaciones. Como la opinión mayoritaria, según mi criterio, no logra esto en toda su extensión, respetuosamente disiento.


Liana Fiol Matta
Jueza Asociada